## SAMUEL J. ADAMS *vs.* THE COUNTY COMMISSIONERS OF SOMERSET COUNTY.

*Action Against County Commissioners for Non-Repair of Bridge—Misleading Instruction.*

While the plaintiff was driving over a county bridge, across a ditch, one of the planks broke. The horse stumbled over the obstruction, and plaintiff was thrown out and injured. After the accident, it was discovered that the broken plank had previously appeared to be sound, but was shivered underneath. The plaintiff's evidence showed that about two weeks before the accident, a third person had informed the road supervisor that there was a defective plank in this bridge, but the supervisor testified that the information so given him related to another bridge in the vicinity. Under these circumstances, in an action against the County Commissioners for their failure to keep the bridge in repair, according to their statutory duty, it is error to instruct the jury that their verdict must be for the defendants, unless they find that the defendants knew, or by ordinary care could have known, the bad condition of the bridge in time to repair the same before the accident, or could not, by the exercise of ordinary care, have discovered the defect in the bridge. Such instruction ignored the evidence as to the notice to the road supervisor. Notice to him was notice to the defendants; and the jury might have inferred from the instruction that because the commissioners did not have personal knowledge of the defect in the bridge, they were not liable.

*Decided May 17th, 1907.*

Appeal from the Circuit Court for Dorchester County (HOLLAND and LLOYD, JJ.)

The cause was argued before BRISCOE, BOYD, PEARCE, SCHMUCKER, BURKE and ROGERS, JJ.

*James E. Ellegood* (with whom were *Henry J. Waters* and *Goldsborough & Fletcher* on the brief), for the appellant.

*Joshua W. Miles* (with whom were *H. L. D. Stanford* and *John R. Pattison* on the brief), for the appellees.

BURKE, J., delivered the opinion of the Court.

This case was instituted in the Circuit Court for Somerset County by the appellant against the County Commissioners of that county, and was tried in the Circuit Court for Dorchester County, to which it hàd been removed.   The trial resulted in a verdict and judgment for the defendant, and the plaintiff has brought this appeal.

The suit was brought for personal injuries to the plaintiff, and for injuries to his horse, wagon and harness alleged to have been caused by a defect in a bridge on one of the public roads of Somerset County.   The declaration contained three counts.   The first count described the personal injuries which the plaintiff suffered, and the pecuniary losses he thereby sustained, and avers that his injuries and losses were due to the negligence of the defendant in permitting a county road and bridge, within said county leading from Hall's corner to Marion postoffice in Somerset County, at a point near the dwelling house of Edward Hall, to be and remain out of repair, and in an unsafe and dangerous condition.   The second count relates to injuries to his horse, and the third to damage to his wagon and harness.   The same act of negligence, as charged in the first count, is averred in the second and third counts.

In each count it is alleged that the defect in the bridge was known to the defendant prior to the accident, which caused the injuries and damage.   This bridge was a very small affair. It was located on the county road described in the declaration, and was constructed over a ditch about six feet wide. Timbers, described in the evidence as sleepers, were placed across the ditch, and covered by oak slabs about seventeen feet long, nailed to the sleepers.   About a week, or ten days before the accident the ditch had been cleaned, and in order to do this work three of the planks had been taken up, and replaced after the cleaning had been done, but the boards had not been nailed to the sleepers.   The surface of the boards appeared to be sound, and showed no decay, or defect of any kind.   The workman who took up the planks to clean the

ditch saw no defect in the boards, and, so far as he could see, the boards of the bridge were sound, and they were replaced by him after the ditching was finished. For the week previous, and up to the morning of the accident, the hauling over the bridge was very heavy. On the morning of the accident, Mr. Isaac H. Whittington, the Road Supervisor, had passed over the bridge. He was walking, and had charge of a team of two mules with a load of wood. He stopped and examined the bridge, and saw that a plank had been pushed out of its place, so that its end was not even with the other boards, and he pushed it back in its place, so as to make the ends more even. He testified that he saw nothing further the matter with the bridge, and that the boards seemed sound and not decayed, and showed no break. This evidence as to the apparent soundness of the bridge was corroborated by other witnesses. The evidence shows that on the day of the accident, and for a number of days prior thereto heavily ladened wagons had passed over the bridge, and no defect therein was noticed by those in charge of the teams. Four witnesses on behalf of the plaintiff testified that a short time before the accident, while driving across the bridge, one of its planks showed weakness, but that it showed no defect on the outward surface. It is clear from all the evidence that the defect in the bridge was a latent, or hidden defect, not readiy, or easily discoverable without a careful examination, or without the existence of some special circumstance calling attention to it.

The plaintiff offered evidence tending to prove the following facts: That on the morning of September 15th, 1905, he was riding in his wagon from his home to Marion Station in Somerset County over the public road upon which the bridge spoken of is located, and while driving over the bridge his horse stumbled and fell; and that he was thereby thrown from his wagon; that his head struck the ground, rendering him almost senseless; that when he recovered himself he was standing in the road; that his horse's right leg was fastened in the bridge; that the shafts and other parts of his wagon were broken; that he repaired the wagon temporarily, and then

drove to Marion Station and afterwards to his home. He further offered evidence tending to show that he was seriously and permanently injured; that he suffered intense pain; incurred expense; and is incapable to perform his accustomed work; and that his injuries may result in paralysis and death. He testified that in riding over the bridge he had no knownledge of any weak, or defective plank in it, and that there was nothing on the surface of the bridge to indicate that there was a weak, or defective plank therein. After the accident it was found that one of the boards was broken, and was shivered on the underneath side, although this defect was not visible on the surface; that this shiver weakened the plank, but the board was otherwise sound. When the plaintiff's horse stepped upon this weak spot the board split lengthwise, and the horse's foot was caught, and in this way the accident occurred.

Because of the concealed character of the defect in the bridge, the testimony of Lee Carver, and Isaac H. Whittington, the Road Supervisor, who had charge of this road and bridge, becomes most important. Lee Carver testified that he had driven over this bridge nearly every evening during the week previous of August 13th, or August 20th, 1905, and that either on August 13th, or 20th, in driving over the bridge, he discovered a defective plank by noticing that it bent down when his horse stepped on it; and that he passed over it without difficulty, or injury, but got out of his carriage and examined it. He found that the weak plank was a board showing no defect on the upward surface, not decayed at all, nor broken but shivered on the underneath side, and that he pushed the plank so as to make the shivered, or weak place come over the sleeper, which made it project beyond the other planks at one end and short at the other; that during the week following the 13th or 20th of August, he saw Mr. Whittington, the Road Supervisior in charge of this road and bridge, and told him that there was a bridge near Will Hall's place which had a weak or defective board in it, and that he pushed the board as described above, and that Mr. Whittington said that he would attend to it. On cross-examination this wit-

ness said that he did not know whether he told the Supervisor that there was a bridge, or that the bridge near Will Hall's residence was defective and further testified that there was a big bridge nearer Will Hall's residence than the bridge where the accident occurred; that this big bridge was about 150 yards above the bridge where the accident occurred, but that he did not tell the Supervisor that it was the big bridge near Will Hall's residence, but did tell him that the bridge had a plank in it short at one end.   Mr. Whittington testified that Lee Carver told him that the bridge with a defective, or weak plank in it was the big bridge down by Will Hall's, and that he went and examined the big bridge, and had it repaired, although he found little, if anything, the matter with it.   He had, however, previously testified, as we have seen ,that in passing over the bridge where the accident occurred on the morning the plaintiff was injured, he saw that there was a plank pushed out of its place so that its end was not even with the other boards.

The record presents three bills of exceptions, two of which relate to questions of evidence, and one to the rulings of the Court on the prayers.   As the main question in the case arises under the last exception, that will be first considered.   The plaintiff offered four prayers, and the defendant three.   The Court granted all the prayers offered on each side.   To the granting of the defendant's prayers the plaintiff excepted, but the defendant took no exception to the granting of the plaintiff's prayers.   The purpose of instruction is to inform the jury clearly and pointedly as to the law of the case so as to leave no reasonable ground of misapprehension, or mistake.   They should not be equivocal, or ignore evidence tending to prove a fact having an important bearing upon the law of the case, although the evidence as to that fact may be contradicted by the testimony of other witnesses.

The principles of law by which the responsibility of County Commissioners for accidents occurring on public roads and bridges, in cases where that responsibility has not been modified, or changed by local statutes, are well settled by decisions of this Court, and are well understood.   In the case of

the *County Commissioners of Baltimore County* v. *Hattie E. Wilson*, 97 Md. 207, JUDGE SCHMUCKER, who delivered the opinion of the Court, after quoting secs. 1 and 2 of Art. 25 of the Code of Public General Laws, said: "It has been repeatedly held by this Court that these sections of the general law not only conferred the power, but also imposed the duty upon the County Commissioners to keep the public roads in a safe condition; and that, as the law provided them with proper agents for the discharge of these duties and the power to levy the requisite taxes for the repair of the roads, it made them liable for injuries resulting from the non-repair of such roads, or the existence of dangerous obstructions upon them." In the case of the *County Commissioners of Anne Arundel County* v. *Duvall*, 54 Md. 355, the Court referred to the cases of *Duckett*, 20 Md. 468; *Gibson*, 36 Md. 239; and *Baker*, 44 Md. 1, and said: "In all of those cases the injuries, for which the County Commissioners were held liable, resulted directly from the bad condition of the public roads or bridges. The County Commissioners are especially charged by law with the duty of keeping these in good repair and safe for the travel of the public: *Tyson's case*, 28 Md. 510; *Walter's case*, 35 Md. 394, and cases above cited. If they fail to do so, and injury results, they are liable in an action at law, not by virtue of any liability at common law, but because they are made so by statute. They are not permitted to excuse themselves by the fact that the Road Supervisor is also required by law to keep the public road in repair, and may be made liable in a penalty or in damages for a failure to do so. Their obligation is a paramount and pre-existing one, and can not be discharged by the failure of another to do that which they, the Commissioners, are required by law to do."

The instructions granted at the instance of the defendant will now be examined in the light of these principles. The defendant's first prayer, after instructing the jury that the County Commissioners are not insurers against accidents occurring on the public roads and bridges, nor are they required by law to make and keep them in perfect condition and

repair, but only that they should use reasonable care and dili-
gence in the exercise of the powers vested in them in regards
to the public roads and bridges, asserted the proposition that
even if the jury should find that the bridge was out of repair,
and not in perfect condition, "Yet before they can find a ver-
dict for the plaintiff, they must find that the *defendant knew*,
or by ordinary care could have known the bad condition of
the bridge, in time to repair the same before the accident; and
if the jury find from the evidence that the defendant, or its
agent, the Road Supervisor could not, by the use of reason-
able or ordinary care and diligence in the exercise of the
powers vested in them, have discovered the defect in said
bridge, then their verdict must be for the defendant."

There was not a particle of evidence in the case that the
County Commissioners had any actual or personal knowledge
of the defect in the bridge, and in view of the character of the
defect it might well have been argued that neither the Com-
missioners, nor the Road Supervisor by the exercise of ordi-
nary care could have known of the unsafe condition of the
bridge. The plaintiff had alleged that the defendant knew,
prior to the accident, that the bridge was unsafe, but in order
to charge the defendant with knowledge it was not necessary
for him to show actual, or personal knowledge by the Com-
missioners. Notice communicated to, or knowledge ac-
quired by Mr. Whittington, the Road Supervisor, as to the
unsafe condition of the bridge was notice to the Commission-
ers, and gratified the allegations as to the knowledge on their
part set out in the *narr.* The plaintiff offered evidence tend-
ing to prove that prior to the accident Mr. Whittington had
this knowledge, although he denied that evidence, but that
was a question for the jury.

This prayer, no doubt, announced a sound general propo-
sition of law, but as applied to the facts of this case it is per-
fectly obvious that it was most misleading and objectionable.
It was vague, indefinite, and equivocal as to the question of
notice, and ignored all reference to the testimony as to the
knowledge of the Road Supervisor of the dangerous condition

of the bridge, which was, perhaps, the crucial and controlling question in the case. As framed, the jury might have readily concluded that because the Commissioners did not have personal knowledge of the defect in the bridge they were not liable, and it might have been so argued under this instruction. In addition of the other facts stated in the prayer, had it stated that before the jury could find for the plaintiff they must find that the defendant, or its agent, the Road Supervisor in charge of the road and bridge, knew of the bad condition of the bridge, the instruction would have been free from objection. The defendant's second prayer is open to the same objection, but we find no error in its third prayer.

The question asked Dr. Guy Steele, and the answer of the witness thereto, which constitute the first and second exceptions, were properly allowed, in view of the testimony given by the physicians, who testified on the part of the plaintiff, as this evidence tended to lessen the value of their testimony as to the exact nature of the plaintiff's injury. For the error committed in granting the defendant's first and second prayers the judgment must be reversed.

> *Judgment reversed, and case remanded for a new trial with costs to the appellant above and below.*