## GODWIN *v.* COUNTY COMMISSIONERS OF ST. MARY'S COUNTY

[No. 131, September Term, 1969.]

*Decided January 6, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, SMITH and DIGGES, JJ.

*Neal P. Myerberg,* with whom were *Briscoe & Kenney* and *Charles A. Norris* on the brief, for appellant.

*George Beall,* with whom were *Herbert F. Murray, M. King Hill, Jr.* and *Smith, Somerville & Case* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The sole question presented by this appeal is whether or not by virtue of Code (1964 Replacement Volume), Art. 89B, §§ 220, 221, and 222 added to the Code by the Acts of 1947, Ch. 560 providing, *inter alia,* that the State Roads Commission should undertake, carry out and perform the construction, reconstruction and maintenance of county roads in eleven Maryland counties, including St. Mary's County, relieved the County Commissioners of St. Mary's County, appellee and defendant below, from tort liability for an alleged defect in a county road in St. Mary's County alleged to have been a proximate cause of injuries to Penelope Adora Godwin, the appellant and plaintiff below.

The appellant, on November 8, 1968, filed an action in the Circuit Court for St. Mary's County (Dorsey, J.) to recover damages for personal injuries she sustained in an automobile accident occurring on August 26, 1967. She was a passenger in the front seat of a 1965 Ford

Mustang automobile owned and operated by John H. Browning which left the paved portion of St. Andrew's Church Road, a public road in St. Mary's County, and struck a tree. Both Mr. Browning and the County Commissioners of St. Mary's County were joined as parties defendant. It was alleged in the declaration that the County Commissioners negligently caused her injuries by (1) failing "to keep and maintain St. Andrew's Church Road in good construction and repair", (2) "failing to have St. Andrew's Church Road properly marked and designated and reasonably safe for the passage of persons using" it, (3) "permitting St. Andrew's Church Road to become and remain in an unsafe and dangerous condition", (4) "not properly and adequately laying out and constructing St. Andrew's Church Road", (5) "failing to keep St. Andrew's Church Road properly and adequately marked and posted by warning signs * * *, slow speed warnings or other devices to designate the contour, curve, grade and permissible speed for the conditions prevailing", and (6) "failing to make timely and seasonable recommendations to the State Roads Commission for the State of Maryland, for reconstruction of such road and the correction of such unsafe, defective and dangerous conditions", and this negligent conduct was alleged to be a proximate cause of the injuries sustained by the plaintiff. The damages claimed were $500,-000.00.

On November 29, 1968, the defendant County Commissioners of St. Mary's County, pursuant to Maryland Rule 323 b filed a motion to dismiss the action on the ground of governmental immunity and for reasons for the motion, stated:

"By the terms of Article 89B, Sections 220 and 221, Maryland Code Annotated, the responsibility to keep or maintain St. Andrews Church Road in good construction or repair and to have the said St. Andrews Church Road properly marked, posted and designated and reasonably

safe for vehicular traffic is imposed upon the Maryland State Roads Commission and not upon this defendant, and thus defendant therefore is not subject to suit in this action."

After argument and the filing of trial memoranda on behalf of the respective parties, Judge Dorsey filed a carefully considered written opinion and sustained the motion to dismiss. An appeal was timely taken by the plaintiff to this Court.

To afford the proper setting for the decision in the present case, it is necessary to review briefly the theory and application of the doctrine of sovereign immunity in Maryland.

Sir William Blackstone gives the basis of the doctrine of sovereign immunity from suit in his *Commentaries,* as follows:

> "*Royal Dignity.* In every monarchy, it is necessary to distinguish the prince from his subjects, not only by outward decoration, but by ascribing to him certain qualities, as inherent in his royal capacity, distinct from any other individual in the nation. He is presumed to possess certain attributes of a great and transcendent nature, by which the people are led to look upon him as a superior being.

> "I. *His Sovereignty.* He is said to have imperial dignity, and is styled *basileus* or *imperator.* His realm is termed an empire, and his crown imperial. He owes no subjection to any other earthly potentate. No suit or action, even in civil matters can be brought against the king, because no court can have jurisdiction over him. Authority to try would be in vain, without authority to redress; the sentence of a court would be contemptible, where it could not enforce execution, and who shall command the

king? His person is sacred, even though his measures be tyrannical and arbitrary, for no jurisdiction can try him in a criminal manner, much less condemn him to punishment."
(*Browne's Blackstone's Commentaries*, p. 77)

\* \* \*

"II. *His Absolute Perfection.* The king can do nothing wrong. This means, that whatever is exceptionable in the conduct of public affairs, is not to be imputed to the king, nor is he answerable for it personally to the people. It also means, that the prerogative of the crown extends not to any injury; it is created for the good of the people, and therefore cannot be exerted to their prejudice."
(*Id.* at 78)

Professor Borchard in his article in 34 Yale L. J. 1, 129 entitled "Government Liability in Tort," stated:

"The reason for this long continued and growing injustice in Anglo-American law rests, of course, upon a medieval English theory that 'the King can do no wrong', which without sufficient understanding was introduced with the common law into this country and has survived mainly by reason of its antiquity. . . ."
(*Id.* at 2)

Professor Prosser in his "Law of Torts," (third edition) Chapter 27, "Immunities" pages 996, 997, and 1001 states:

"While these [immunities of governments] may or may not have had their roots in Roman law, the origin of the idea underlying them in the common law seems to have been the theory, allied with the divine right of kings, that 'the King can do no wrong,' together with the feeling that it was necessarily a contradiction of

his sovereignty to allow him to be sued as of right in his own courts."
(*Id.* p. 996)

\* \* \*

"Just how this feudal and monarchistic doctrine ever got itself translated into the law of the new and belligerently democratic republic in America is today a bit hard to understand. In 1821 Chief Justice Marshall gave no reasons when he declared that, without its consent, no suit could be commenced or prosecuted against the United States. Following this, it soon became established that the government could not be sued without its consent."
(*Id.* p. 997)

\* \* \*

"The sovereign immunity likewise carried over from the English crown to the several American states. There was an abortive attempt on the part of Chief Justice Marshall to change the rule; but it led only to the Eleventh Amendment to the federal Constitution, protecting any state from suit by a private citizen in the federal courts. Thereafter the doctrine became firmly established, that there is no state liability in tort unless consent is given. The immunity is said to rest upon public policy; the absurdity of a wrong committed by an entire people; the idea that whatever the state does must be lawful, which has replaced the king who can do no wrong; the very dubious theory that an agent of the state is always outside of the scope of his authority and employment when he commits any wrongful act; reluctance to divert public funds to compensate for private injuries; and the inconvenience and embarrassment which would descend upon the government if it should be subject to such liability."
(*Id.* p. 1001)

See also an interesting, comprehensive and helpful review of the Maryland law in regard to "Municipal Responsibilty in Tort in Maryland," 3 Md. L. Rev. 159 (1938) by George L. Clarke.

As we have seen, there are legal scholars who are of the opinion that when the separation from the mother country and its monarchy occurred at the time of the War for American Independence, so that the new States had no *personal* sovereign, the reasons underlying the doctrine of sovereign immunity — based principally on monarchical concepts — were no longer applicable and the doctrine of sovereign immunity should never have been applied in the new States or to the United States under the Federal Constitution where, of course, no *personal sovereign* existed. It is well established, however, that the doctrine was applied in the new States and was held to be applicable to the United States as one of the dual "sovereigns" in the federal system. The application of the doctrine in this country was most likely based more upon reasons of public policy than upon the concept of the new States or the United States being successors, as it were, of the former king. Indeed, it is clear in Maryland that public policy was a consideration for the application of this doctrine. In *State v. B. & O. R.R. Co.*, 34 Md. 344, 374 (1871), Bartol, C.J. stated for the Court:

> "This [sovereign] immunity belongs to the State by reason of her prerogative as a sovereign, *and on grounds of public policy*. Parties having claims or demands against her, must present them through another department of the Government—the Legislature—and cannot assert them by suit in the courts." (Emphasis supplied.)

When one considers the financial and other problems which might arise if the doctrine of sovereign immunity were not applicable, it was probably wise that our predecessors did apply it in Maryland, with the possi-

bility of legislative relief as suggested in *State v. B. & O. R.R. Co., supra.*

As applied in Maryland, the doctrine of sovereign immunity is not only applicable to the State, itself, as a governmental agency, but is also applicable to its agencies and instrumentalities, including its municipal political sub-divisions, if engaged in a governmental function as an agent of the State, unless the General Assembly either directly or by necessary implication has waived the immunity. In *State v. Rich,* 126 Md. 643, 645, 95 A. 956, 957 (1915), our predecessors held that the sovereign immunity of the State from liability for tort extended to the State Roads Commission, the Court pointing out, however, that the *Commission* could be made liable to be sued for negligence by legislative enactment. The immunity also generally applies to a county of the State when exercising a governmental function as an agent of the State, but not when it is acting in its corporate capacity in maintaining public highways in the county under the management and control of the county. *Cox v. Anne Arundel County,* 181 Md. 428, 31 A. 2d 179 (1943). In the *Cox* case, Judge (later Chief Judge) Marbury, for the Court, stated:

> "Governments are immune from suit by individual citizens, unless the right is expressly given. The reason for this immunity is stated by Mr. Justice Holmes in the case of *Kawananakoa v. Polyblank,* 205 U. S. 349, 51 L. Ed. 834: 'Some doubts have been expressed as to the source of the immunity of a sovereign power from suit without its own permission, but the answer has been public property since before the days of Hobbes. Leviathan, Chap. 26, 2. A sovereign is exempt from suit, not because of any formal conception of obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.'

When the State gives a city or county part of its police power to exercise, the city or county to that extent is the State.

"It is difficult to find a good reason for holding that a municipality (using the word in its broad sense) is not exercising the police power for the safety of the public when it is maintaining public highways. However, the rule in this State and in other jurisdictions is that, in such case, the municipality is acting in its corporate capacity, and is liable to suit for its negligence. In discussing this question this court in the case of *Mayor and City Council of Baltimore v. State,* 173 Md. 267, 273, 195 A. 571, 574, said: 'But the two principles, one that a municipal corporation is not liable in a civil action for any default or neglect in the performance of a purely governmental function, and the exception, that it is liable for failure to keep the public highways under its management and control in a reasonably safe condition, are too firmly embedded in our law to be disturbed now.' " (181 Md. at 431, 31 A. 2d at 181.)

It is of importance in the present case to observe that the liability of a county for its negligence arising out of its maintenance and control of the county roads is an *exception* to the general rule that counties share in the immunity of the sovereign. In *County Commissioners of Baltimore County v. Wilson,* 97 Md. 207, 54 A. 71 (1903) Judge Schmucker, for the Court, after reviewing the statutory provisions giving Baltimore County charge and control over the county roads with the power to appoint road supervisors and other officers and agents to construct roads and to manage and control the county roads, stated:

"It has been repeatedly held by this Court that these sections of the general law not only conferred the power, but also imposed the duty up-

on the County Commissioners to keep the public roads in a safe condition; and that, as the law provided them with proper agents for the discharge of these duties and the power to levy the requisite taxes for the repair of the roads, it made them liable for injuries resulting from the non-repair of such roads or the existence of dangerous obstructions upon them. *Duckett's case,* 20 Md. 468; *Gibson's case,* 36 Md. 229; *Baker's case,* 44 Md. 9; *Eyler's case,* 49 Md. 269; *Duvall's case,* 54 Md. 354. It was admitted in these cases that there was no such liability at common law or by the express terms of the statute, but it was held to have arisen by necessary implication from the powers and duties of the commissioners under the several provisions of the general law."

(97 Md. at 210, 54 A. at 72.)

The *basis* for the exception in regard to the county's liability for its negligence in connection with its construction or maintenance of the county roads proximately causing injuries to those using the roads, is the power and control of the county over the roads and their maintenance and the power to levy and expend the necessary taxes for county road repair. It is clear, therefore, that if such power and control over the repair and maintenance of the roads are removed from the county by statute, the normal application of the doctrine of sovereign immunity applies and the county is no longer liable for negligence in connection with the repair and maintenance of the county roads proximately causing injuries or property damage to a potential plaintiff. Our predecessors so held in the *Wilson* case, *supra,* closely analogous to the present case.

The 1965 Code of Public Local Laws of St. Mary's County (the St. Mary's County Code), Section 150, under the sub-title "Roads" provides:

"The County Commissioners of St. Mary's

> County are authorized and empowered to control and regulate the public roads and bridges in said county, subject to the provisions of this sub-title."

This provision is substantially the same as a similar provision in the Acts of 1876, Ch. 238, the Acts of 1878, Ch. 499 and the Acts of 1908, Ch. 381, Section 100.

In 1933, the General Assembly, in order *to aid* the counties of the State financially in their respective road construction and maintenance programs amended the provisions of Article 56 (titled "Licenses") and Article 89B (titled "State Roads") of the then Maryland Code by the Act of 1933, Ch. 425. This Act provided for the allocation of a fixed percentage of the State gasoline tax to be credited to the State Roads Commission and allocated to the various counties in the proportion which the public road mileage of the several counties bore to the entire public road mileage in all the counties of the State. The provisions of the new sections 7A to 7F added to Article 89B became effective June 1, 1933, and remained in effect until September 30, 1935, after which time they became void. The relevant provisions of the 1933 legislation are set forth in *County Commissioners of Howard County v. Leaf*, 177 Md. 82, 87-88, 8 A. 2d 756, 758 (1939), and need not be summarized here. In the *Leaf* case, it was contended that this 1933 legislation had so removed the power and control of the counties over the public roads and the necessity to levy taxes for road construction and maintenance as to remove liability for the consequences of negligent actions on the part of the County Commissioners in connection with the repair and maintenance of the county roads. In holding that this 1933 legislation did not have that effect, Judge Johnson, for the Court, stated:

> "These and other provisions make it clear that the sections relied upon by the appellants are of a temporary nature, and for their continuance further legislation is necessary. In addi-

tion, the expenditures by the State Roads Commission are of a special fund, and the application of the funds is ultimately for the decision of the Commission; and there is no requirement that such expenditure of such special fund shall be exclusively to one or more of the highway purposes of a county, nor cover the whole field of repair and maintenance, so as to relieve the County Commissioners of all duty and responsibility. The statute negatives such an argument when it simply relieves the County Commissioners, while they are temporarily receiving the tax, of the obligation to levy, under local laws, a minimum amount or rate for road maintenance purposes. Section 7F. So, the powers, and, consequently, the duty, of the County Commissioners to levy for all necessary road purposes subsists. The agency of the State Roads Commission under the special statute is for the benefit of the county as the principal, and is not to the exclusion of the principal's duty and power to keep the county highway safe for public travel. The suspension of the obligation to levy a minimum amount or rate is simply to relieve the Board of County Commissioners from the necessity of levying more than is required. The amount of the tax apportioned to a county may be inadequate for any one of the permitted purposes for which it may be applied, and could it be successfully contended that this inadequacy would, by force of the statute, exonerate the municipal corporation from the discharge of its primary and permanent duty in that regard?"
(177 Md. at 89-90, 8 A. 2d at 759)

By the Act of 1935, Ch. 465, Sec. 4 the new sections 7A to 7F of Art. 89B were continued in effect until September 30, 1937, and by the Act of 1939, Ch. 766 old

Section 7F of Art. 89B in the 1935 Supplement to the Code then Sec. 19 of Art. 89B of the 1939 Code was continued in force until repealed. This section provided that the County Commissioners or other duly constituted local authorities were released from the requirements of existing law with respect to levying a minimum amount or a minimum rate for road maintenance purposes. The Act of 1941, Ch. 888 modified the allocation and expenditure of the lateral road gasoline tax and eliminated Carroll and Garrett Counties from the list of counties where roads were maintained by the State Roads Commission. The Act of 1945, Ch. 841 authorized, between July 1, 1945, and June 30, 1947, the County Commissioners in each county with the approval of the State Roads Commission to apply or authorize the application of their allocated share of the lateral road gasoline tax fund for either maintenance, construction or reconstruction of roads and bridges in the several counties, in whatever proportion the County Commissioners and the State Roads Commission might mutually agree upon, notwithstanding any other provisions of law.

It is in this statutory setting that the Act of 1947, Ch. 560 was passed making comprehensive changes in the prior law in regard to the financing, planning, constructing and maintaining of the public roads in the State. The important provisions of the Act of 1947, Ch. 560, with subsequent amendments, which are of importance in the present case are now Art. 89B, §§ 34, 36, 220, 221 and 222, of the Maryland Code (1969 Replacement Volume).

It should be observed that in the legislation prior to the Act of 1947, Ch. 560 gradually and for limited periods (later extended) increased the power and control of the State Roads Commission over the county roads of the State on which a portion of the lateral gasoline tax was used for their construction, reconstruction, maintenance and repair, but the County Commissioners retained part of their power over and control of the roads as well as the obligation to levy local taxes for the re-

pair and maintenance (but not within previously established mandatory provisions) of the county roads.

By the Act of 1947, Ch. 560 far reaching changes in the law were made in regard to all counties and a fundamental change was enacted in regard to certain designated counties. Using the sections of Art. 89B of Code (1969 Repl. Vol.) for reference, § 34 provides for an allocation of 20% of the money paid into the Gasoline Tax Fund, together with other money from the Motor Vehicle Revenue Fund, by the State Roads Commission for the account of each county on a proportional mileage basis. Subsection (d) of § 34 provides in regard to the payment and use of the allocated funds, that the share of each county should be paid by the State Treasurer upon warrants of the Comptroller to the public local authorities at monthly intervals or at other appropriate times as reasonably requested, "or, in the case of a county whose road construction, reconstruction or maintenance is performed by the State Roads Commission, the State Treasurer shall credit the county's share to the account of the State Roads Commission to be expended upon warrants of the Comptroller. Monies so paid or credited shall be used and expended by such county officials or by the State Roads Commission, as the case may be, as follows." Then follow the provisions in regard to the expenditure of the allocated money, first to debt service and then "solely for the construction or maintenance of county roads * * *." Subsection (f) provides, *inter alia,* that no distribution shall be made to any county, unless it shall have levied for the current year taxes sufficient to collect a minimum of $1.00 per capita in revenue, and if there is a failure to make such a levy, the otherwise distributable share shall revert to the Gasoline Tax Fund to be paid over to the State Roads Commission for its use.

Section 36 provides, in relevant part, that no construction or reconstruction of any county roads shall be performed under § 34 unless the State Roads Commission shall have first approved the location, plans and specifi-

cations for the roads, such approval to be granted if, in the Commission's judgment, the county roads, when constructed or reconstructed, will be reasonably adequate and appropriate to an existing or potential integrated secondary highway system. If any county in the judgment of the County Commissioners does not have adequate facilities to carry on the construction, reconstruction and maintenance contemplated under § 34, then the State Roads Commission until July 1, 1948, to the extent of funds allocated to the county, is authorized to undertake such construction, reconstruction or maintenance for the account of the county. Subsection (c) of § 36 provides that except as provided in Subsection (a) and (b) of § 36 and in certain sections "and except as may be authorized from time to time by provisions contained in this article under the subtitle 'Special Provisions as to Designated Counties,' the State Roads Commission, after June 30, 1947, shall have no duties, responsibilities or authority with respect to construction, reconstruction or maintenance of any roads other than State roads."

We now turn to the three critical sections of Art. 89B under the subheading "Special Provisions as to Designated Counties."

Section 220 provides that notwithstanding the provisions of § 36 of Art. 89B, the State Roads Commission "is hereby authorized and directed, as contracting party or otherwise, to undertake, carry out and perform the construction, reconstruction and maintenance of county roads * * * within, and for the account of" the listed eleven counties, including St. Mary's County.

Section 221 provides that as to the counties mentioned in § 220 "the cost of construction, reconstruction and maintenance of county roads (including overhead charges of the State Roads Commission allocable thereto) shall be paid from the funds from time to time available to the county" under § 34 or from the proceeds of bonds lawfully issued by the county or by a municipality within the county for such purposes, or from "any other

funds" from time to time lawfully provided for such purposes. Section 221 then provides:

> "The county commissioners or road authority of each county so named shall from time to time deliver to the State Roads Commission statements recommending roads to be constructed or reconstructed and recommending the application of funds to road maintenance. After considering such recommendations, the State Roads Commission shall determine what county roads are to be constructed or reconstructed and what portion of available funds are to be used for maintenance in order that the work done will be reasonably appropriate to an existing or potential integrated secondary highway system. Construction and reconstruction shall be done in accordance with the standards fixed by the respective counties and approved by the State Roads Commission. Such standards may include low-cost county road standards."

Section 222 provides that if any one of the eleven enumerated counties "shall hereafter desire to take over and perform the construction, reconstruction and maintenance of its county roads on its own behalf and for its own account," the county commissioners may make a written request to the State Roads Commission at least 90 days in advance of the beginning of the first fiscal year the request is to take effect and if the Commission feels that the requesting county "has, or is reasonably assured of obtaining adequate facilities for constructing, reconstructing and maintaining roads, *and* that such county has, or is reasonably assured of obtaining the services of a roads engineer having a degree of civil engineering and experience in constructing roads" or has had a 10-year period of practical experience, "then the State Roads Commission shall by resolution *relinquish and transfer* to the county the functions of constructing, reconstructing and maintaining the county roads with-

in that county." This transfer becomes effective the first day of the fiscal year following the county request "and thereafter the State Roads Commission shall have no duties, responsibilities or authority with respect to the construction, reconstruction and maintenance of county roads of the particular county affected other than as prescribed by § 36 of this article with respect to county roads in general." (Emphasis supplied.)

In § 2 (the definitions section of Art. 89B) the term "county roads" is defined by subsection (d) to include "any public roads, excluding State roads * * * title to which * * * is vested in a public body or governmental agency by grant, condemnation or dedication." Subsection (e) of § 2 defines the term "maintenance" as "the process of upkeep and repair, other than reconstruction and relocation, by which a road * * * [is] kept in an ordinarily efficient operating condition."

Code (1967 Replacement Volume), Art. 66½, §§ 189 and 190 provides for the adoption by the State Roads Commission of a uniform system of traffic control devices for use on the highways of the State and provides that the Commission shall place such signs upon all highways within its jurisdiction. By Art. 89B, § 103, any person other than the State Roads Commission (or the incorporated cities or towns of the State) is guilty of a misdemeanor if he displays stop, slow, danger, and other warning signs of like nature within 300 feet of a road, street or highway in the State.

It is clear to us that the Act of 1947, Ch. 560, so far as the eleven designated counties, including St. Mary's County, are concerned established a new system of control over the roads in those counties. After the effective date of that Act and continuing until a county, with the approval of the State Roads Commission after ascertaining that the statutory conditions are fulfilled, regains control of its county roads, the State Roads Commission was directed to exercise complete power and control over the maintenance of the county roads of the eleven coun-

ties. By the same Act, the means and power to construct, reconstruct, repair and maintain those roads were removed from the County Commissioners. When this occurred, the responsibility of the County Commissioners for any tort liability arising out of the negligent repair or maintenance of the county roads in the eleven counties ceased. This removal of the power to control the county roads and of the means to repair and maintain them, distinguishes from the present case the prior decisions of this Court imposing such liability, namely, *The County Commissioners of Anne Arundel County v. Duckett*, 20 Md. 468 (1864), *supra; The County Commissioners of Calvert County v. Gibson*, 36 Md. 229 (1872) ; *The County Commissioners of Allegany County v. Broadwaters*, 69 Md. 533, 16 A. 223 (1888) ; *Adams v. The County Commissioners of Somerset County*, 106 Md. 197, 66 A. 695 (1907) ; *Richardson v. The County Commissioners of Kent County*, 120 Md. 153, 87 A. 747 (1913) ; *The County Commissioners of Howard County v. Leaf*, 177 Md. 82, 8 A. 2d 756 (1939), *supra; The County Commissioners of Carroll County v. Staubitz*, 231 Md. 309, 190 A. 2d 79 (1963).

As we have indicated, the present case is closely analogous to *The County Commissioners of Baltimore County v. Wilson*, 97 Md. 207, 54 A. 71 (1903), *supra.*

In *Wilson*, the General Assembly by the Act of 1900, Ch. 685 provided for a Board of Road Commissioners in each district in Baltimore County which, with the advice of the Roads Engineer (appointed by the Governor), would adopt the system for the repair and improvements of the roads in their respective districts. The road commissioners were directed to keep books showing in detail the cost of labor and materials used in the repair or improvement of the roads and when a statement of these costs, approved by the road engineer, was presented to the County Commissioners, who after audit, were *required to direct their payment* to an amount not exceeding the special road tax collected for the district for that year. The Act of 1900 also provided that the road com-

missioners "shall take charge of all roads and bridges in their respective districts, and shall see that no obstruction, hindrance or injury is permitted upon any road or bridge under their supervision." This Act further provided that the County Commissioners should levy annually a road tax within certain limits for use of the roads and bridges of which 5% should be applied to the general use of the county roads and bridges, the balance to be set apart as a special road and bridge fund for the use only of the district from which it had been collected. A Mrs. Wilson was injured when, with no fault of her own, her vehicle was overturned by running upon a rick of stone some three feet high negligently left on the county road by a neighboring farmer with the permission of one of the road commissioners and remained on that road for a long space of time. She recovered a judgment against the County Commissioners of Baltimore County. This judgment was reversed on appeal (Judges Jones and Briscoe, dissenting). Judge Schmucker, for the Court, stated:

> "The Road Commissioners are, it is true, appointed by the County Commissioners from a certain class of taxpayers, and they may be removed for neglect of duty by the County Commissioners after charges made and hearing thereon, but they do not act under the direction or supervision of the County Commissioners in keeping the roads in safe condition, as the charge and management of the roads is conferred by the local law upon the Road Commissioners themselves. Not only are the persons directly charged with the care of the roads thus made practically independent of the County Commissioners, but the power of the latter to levy taxes for the use of the roads is now so limited and restricted as in effect to deprive them of their former discretion as to the application of the funds raised by those taxes.

"As by this local law, which prevails over the general law wherever the two conflict, the County Commissioners of Baltimore County have been shorn of the very powers and duties which constituted the only ground of their liability for damages for injuries caused by the condition of the public roads, it follows, as a matter of course, that their liability for such damages no longer exists. If it be objected that the conclusion which we have reached as to the effect of this local road law deprives the users of roads in Baltimore County of that redress for injuries resulting from defects therein which is afforded to those using roads in other portions of the State, we are compelled to reply that the remedy for that situation must be sought at the hands of the Legislature and not of the Courts." (97 Md. at 213, 54 A. at 73-74.)

Judge Jones, in his dissenting opinion concurred in by Judge Briscoe, was of the opinion that the road commissioners were agents and servants of the county and that the County Commissioners had the power to revoke their commissions for neglect of duty or malfeasance in office and hence retained some modicum of control over the road commissioners. Under these circumstances, the dissenting judges thought that the exception to the doctrine of sovereign immunity should control and the county be held liable.

In our opinion, the instant case is a stronger case for the application of the doctrine of sovereign immunity than was the *Wilson* case. In *Wilson,* the County Commissioners of Baltimore County appointed the road commissioners, had the power to remove them for neglect of duty and levied the basic roads tax used by the road commissioners for the repair and maintenance of the county roads. In the present case the County Commissioners of St. Mary's County obviously do not appoint the members of the State Roads Commission, have no power to re-

move them for neglect of duty or otherwise, and the money used by the State Roads Commission comes from a State tax and not from a local county levy. In addition to these considerations, the employees of the St. Mary's County Road Department are employees of the State Roads Commission, are paid, hired and fired by that Commission, are supervised in their work by the Commission and are eligible for permanent status in the Maryland Classified Service system because of their relationship to the State and by reason of the Act of 1947, Ch. 560. The Honorable Thomas B. Finan, Attorney General and now a judge of this Court, so ruled on September 1, 1961, in an opinion to the Commissioner of Personnel, 46 Opinions Attorney General, 144.

In other states, in cases involving a transfer of jurisdiction and authority over local roads to a state agency, the decisions have been that the local authorities were no longer liable in tort for the negligent repair or maintenance of the local roads. See *Hale v. City of Dallas*, 335 S.W.2d 785 (Tex. 1960) ; *Harlan v. City of Tucson*, 82 Ariz. 111, 309 P. 2d 244 (1957) ; *Leialoha v. City of Jacksonville*, 64 So. 2d 924 (Fla. 1953) ; *Perry v. City of Cumberland*, 312 Ky. 375, 227 S.W.2d 411 (1950) ; *Gillespie v. City of Los Angeles*, 36 Cal. 2d 553, 225 P. 2d 522 (1950) ; *Barnett v. City of Opelousas*, 13 So. 2d 788 (La. 1943) ; *Griffith v. Town of Berlin*, 130 Conn. 84, 32 A. 2d 56 (1943) ; and, *Gardner v. City of Covington*, 86 Ind. App. 229, 156 N. E. 830 (1927).

The appellant earnestly contends that Section 150 of the 1965 Code of Public Local Laws of St. Mary's County, already quoted, giving the County Commissioners of St. Mary's County power to control and regulate the county roads, being a *public local law* must prevail over the provisions of the Act of 1947, Ch. 560, a *public general law* because of the rule of statutory interpretations set forth in Code (1968 Repl. Vol.), Art. 1, § 13 which states "where the public general law and the public local law of any county * * * are in conflict, the public local law shall prevail." This provision does not mean, however,

that a public local law may not be repealed or suspended by a public general law. As Chief Judge Brune, for the Court, stated in *Hitchins v. City of Cumberland*, 208 Md. 134, 144, 117 A. 2d 854, 858 (1955) after referring to Art. 1, § 13:

> "That Section, however, is not, and has never been held to be, an absolute bar to the repeal of a local law by substitution or by implication as the result of the enactment of a Public General Law. The law is well established to the contrary."

See *Hill v. State*, 174 Md. 137, 147, 197 A. 795, 799 (1938) in which Judge Offutt, for the Court, stated:

> "Whether the general law operates concurrently with the local law, repeals, abrogates or suspends it, depends upon the legislative intent."

See also *Green v. State*, 170 Md. 134, 183 A. 526 (1936); *State v. Falkenham*, 73 Md. 463, 21 A. 370 (1891); *Alexander v. Baltimore*, 53 Md. 100 (1880); and *Willing v. Bozman*, 52 Md. 44 (1879).

In our opinion, Judge Dorsey was correct in observing that the public local law in regard to power and control over roads in St. Mary's County and the provisions of Art. 89B, §§ 220, 221 and 222 (Act of 1947, Ch. 560) can be construed together in that the effect of the public local law is suspended and superseded by the provisions of the public general law so long as the State Roads Commission exercises the exclusive control over the county roads in St. Mary's County pursuant to provisions of the public general law, but that the public local law will again become effective as and when the County Commissioners of St. Mary's County apply for and receive back that control pursuant to the provisions of Art. 89B, § 222. During the period when the public local law is suspended and superseded, the control and means of the repair and maintenance of the county roads of St. Mary's County

are in the State Roads Commission and not at all in the County Commissioners of that County, so that the County Commissioners have no liability in tort for the negligent repair or maintenance of those roads when the appellant's injuries occurred.

The appellant relies upon an opinion of District Judge Harvey in a similar action by the present plaintiff and appellant in the United States District Court for the District of Maryland (Civil Action No. 19338), dismissed for lack of diversity of citizenship jurisdiction, in which Judge Harvey indicated that because of the duty of the County Commissioners under § 221 to deliver statements to the State Roads Commission recommending roads to be constructed or reconstructed and recommending the application of funds to road maintenance, an allegation of a negligent failure on the part of the County Commissioners to comply with this requirement which was a proximate cause of the injury would allege a cause of action for the plaintiff. With respect, we do not agree with Judge Harvey. The duty of the County Commissioners to repair and maintain the county roads was removed from them and totally transferred to the State Roads Commission by the Acts of 1947, Ch. 560. Thereafter the County Commissioners had neither the power nor the means to repair and maintain those roads. There then could be no liability because a duty and its breach must concur in order to have a cause of action. *Baltimore County v. Wilson, supra.* See *Gardner v. City of Covington, supra.* The mere obligation to recommend cannot place a duty on the County Commissioners to repair and maintain inasmuch as they had neither the power nor the means to repair and maintain, and the State Roads Commission was under no obligation to carry out any recommendation, in any event.

The appellant also relies upon a charge to the jury by Judge Perry Bowen in the Circuit Court for Charles County in an unreported case, *Plater v. Board of County Commissioners of St. Mary's County,* to support her claim that responsibility for the county roads lies with the

County Commissioners. We cannot tell from a reading of the charge whether or not counsel had raised the question of the effect of Art. 89B, §§ 220, 221 and 222 on what had been the law prior to the Act of 1947, Ch. 560, and, therefore, do not find this case helpful in the present case.

> *Order sustaining the motion to dismiss affirmed, the appellant to pay the costs.*