MAYOR AND CITY COUNCIL OF BALTIMORE *v.*
WALTER LEE SEIDEL, JR. ET AL.

[No. 375, September Term, 1979.]

*Decided January 9, 1980.*

The cause was argued before MORTON, THOMPSON and
WILNER, JJ.

*William Hughes, Associate City Solicitor for Baltimore City,* with whom were *Benjamin L. Brown, City Solicitor,* and *William R. Phelan, Jr., Assistant City Solicitor,* on the brief, for appellant.

*Kenneth P. Niman,* with whom were *Paul D. Bekman* and *Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A.* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court.

The Mayor and City Council of Baltimore (the City) appeal from a judgment entered against it in favor of Walter Lee Seidel, Jr., Frances Seidel, his wife, and Northwestern National Insurance Company. (All of the appellees are hereinafter referred to as the Seidels).

The trial judge entered judgment against the Penn Central Transportation Company (Penn Central) and the City for the sum of $38,515.07. Penn Central did not appeal.

## I. Sufficiency of the Evidence

Appellant's first contention is that the trial judge erred in failing to grant its motion for directed verdict. In considering a motion for a directed verdict, the trial court must assume the truth of all credible evidence, and of all inferences fairly deducible therefrom in the light most favorable to the party against whom the motion is made. *Impala Platinum Ltd. v. Impala Sales,* 283 Md. 296, 328, 389 A.2d 887, 905-906 (1978); thus, we will recite the evidence in the manner most favorable to the appellees.

On February 7, 1973, at approximately 5:00 a.m. appellee Walter Lee Seidel, Jr. was driving his 1972 Ford truck to his place of employment, the F. & M. Schaefer Brewing Co., located at Conkling and O'Donnell Streets in Baltimore City. It was dark and the weather conditions were foggy and misty. Seidel followed his usual route from his home on Wilkens Avenue and, as he approached the plant, made a left turn from Boston Street onto Conkling Street. Approximately forty feet from its intersection with Boston Street, Conkling

Street is crossed at grade by eight sets of railroad tracks, seven of which were in regular use. There were no street lights in the immediate area of the railroad crossing. Mr. Seidel had been using this route to work for the 32 years he had been employed by the F. & M. Schaefer Brewing Co. Seidel drove up to the tracks and stopped his vehicle. After stopping and looking both ways, he proceeded to cross the tracks, at which point his truck was struck by a railroad engine. Seidel testified that he saw no lights on the engine and that he heard no horn or bell. As a result of the collision, Seidel was injured and his truck damaged. The crossing was not protected by active warning devices; the only warning device located at the scene was a crossbuck sign, located on the right side of the northbound traffic on Conkling Street.

The Seidels called Mr. Hugo Liem, Jr., Commissioner of the Department of Transit and Traffic of Baltimore City, who was appointed to the post in 1969, and held the post at the time of the accident in question, February 7, 1973. At the time of the accident, the Department of Transit and Traffic did not maintain any records, documents or memoranda with reference to (1) the number of railroad tracks present at the Conkling Street crossing; (2) the usual or general speed of rail traffic over that set of tracks; (3) the number and frequency of trains using the crossing; (4) the topography or general type of location surrounding the tracks; (5) the frequency of vehicular traffic over the tracks; or (6) the types of signaling, warning or sign devices present at the crossing. Mr. Liem testified that the Department of Transit and Traffic keeps, for a period of time, the records developed by the Police Department with regard to the number and character of accidents. While the Department of Transit and Traffic maintains a "worst corner" list, no railroad crossings were on that list.

The Seidels also called George E. Frangos, an expert in the area of traffic and transportation safety. He gave an opinion that the railroad crossing near the intersection of Boston and Conkling Streets was inherently unsafe and hazardous because of a lack of a proper warning device and because: (1) there was insufficient lighting in the area of the crossing; and

(2) the presence of a utility pole in the vicinity of the crossing constituted a visual obstruction to the motorist northbound on Conkling Street looking west for approaching trains.[1]

Frangos further testified that he studied the accident frequency of the crossing in question. Based on records kept by the Baltimore City Police Department he was able to determine that there had been four accidents at the crossing over a five year period. He further testified that based on a national study of 5,541 crossings controlled only by a crossbuck sign, there existed the probability of one accident occurring every ten years. We quote a portion of his testimony:

"Q. In the course of your study and investigation and the analysis of this railroad crossing, can you describe to the ladies and gentlemen of the jury, please, Mr. Frangos, what factors you considered that went into your analysis in this case? A. The standards for the marking and control of railroad grade crossings are rather — pretty generally well known to the traffic engineering profession. They're contained in the traffic engineering handbook. They're contained in publications of the American Association of Railroads who in turn provide the same input to the manual Uniform Traffic Control Devices. That is a document produced by the U.S. Department of Transportation that represents a national standard for the controlling regulation of traffic through signing, pavement marking and other control devices.

\* \* \*

"Q. What is an advance warning sign? A. It is simply a black on orange informational sign that has railroad crossing ahead indicator on it. There is a pavement marking that is placed in the approach to the grade crossing that has — if you pardon me I will refer to my report. It has an X emblem painted on

---

1. The train which struck Seidel approached the crossing from the west.

the street or the roadway approaching the grade crossing with the initials R-R on either side of this crossing. And at the immediate vicinity of the railroad tracks you have a white mark extended across the pavement to indicate where a vehicle should stop to look down the railroad tracks and see if a train is coming. The advance sign also alluded to an X on it with a R-R on it of course. Of course on the railroad property itself should be the crossbuck with the term railroad crossing on it. In many cases they even identify the number of tracks that are on the crossing.

&ast; &ast; &ast;

"As the hierarchy extends you have wigwag signs — wigwag symbols. Excuse me. They're two pendent shaped devices that sit at a V-shape and when a train is coming down they wave back and forth.

"Q. How are these operated? A. Electronically. A train coming down the track activates a device and it sets the wigwag device into action.

"Q. That is a device that indicates that a train is approaching? A. That's correct.

"Q. What other devices are available? A. Flashing lights.

"Q. How do flashing lights work? A. When a train approaches the intersection they start flashing and warning the drivers that a train is coming.

"Q. Anything else that would be available? A. The highest type is a gate, a gate that literally drops down. These days in these cases they are done automatically and restrains a vehicle from crossing the railroad tracks.

&ast; &ast; &ast;

"Q. That's the same type of protection that was present at this scene? A. That's correct [a crossbuck sign]. It deduced, based on this national study, that the probability of an accident occurring at this type

of control was .103. This means one accident every ten years. That was assigned a relative hazard evaluation of one.

\* \* \*

"Q. Other devices also studied in this study? A. The next device looked at was stop signs. They analyzed 728 crossings across the country that had this type of protection. Probability of an accident occurring here was .06 which means one accident every sixteen years. That had a relative hazard of .58. This means applying a stop sign at a railroad you cut that relative hazard in half.

\* \* \*

"Q. Go on. A. Now, for the wigwags, which I described, they analyzed 303 intersections. Excuse me. 303 railroad grade crossings across the country. The probability of an accident at this type of control was .035, which means an accident once every thirty years.

"Q. Every thirty years? A. Thirty years.

\* \* \*

"Now, the next protection type we come to is flashing lights. They analyzed 795 grade crossings across the country that had flashing lights. And the probability of an accident at this type of control was .021. That means an accident once every fifty years.

"Q. With flashing lights? A. With flashing lights. And the relative hazard here was .2, which means it is five times more effective.

"Q. Than what? A. Than the crossbuck. And, finally, gates. These are gates of all types. They analyzed 128 crossings across the country. Came up with a probability of .011, which means one accident every one hundred years. This was deduced to be ten times effective than simply a crossbuck.

Appellant argues that there was no evidence to show that

Article 20, §§ 13-15 (c) of the Baltimore City Code (1968 ed.) [2] were violated by the City. We disagree. The testimony of Mr.

2. Sections 13-15 (c) of the Code provide:

"13. *Safety device required.*

In order to protect the health, safety, and security of the public at locations within the boundary lines of the City of Baltimore, now or as hereafter existing, where the tracks of any railroad company cross a public street at grade, the railroad company shall install and maintain at such crossing one of the type of signalling, warning or safety devices, in the manner, of the type, and as required under and in accordance with the provisions of Section 15 hereof.

14. *Enforcement of provisions.*

The Director of Traffic of the City of Baltimore is hereby authorized, empowered and directed to enforce the provisions of this subtitle.

15. *Enforcement procedures.*

(a) *Notices; required.* Whenever and wherever the Director of Traffic determines after adequate investigation and consultation with the railroad and the Director of the Department of Public Works that the crossing of a public street or highway at grade by the track or tracks of such railroad in the City of Baltimore creates a condition that reasonably requires more adequate protection in addition to that already provided by the railroad, if any, he shall notify in writing the railroad company owning or operating over said tracks at the particular location of his finding that said crossing reasonably requires further protection and shall order the railroad company either to erect or install and maintain at the crossing (1) automatic gates, or (2) automatic flashing lights, or (3) appropriate warning signs, or (4) to provide train crew protection, or (5) any combination of (1) to (4), inclusive.

(b) *Same; content.* Every such notice issued by the Director of Traffic shall set forth in writing the pertinent facts relative to the particular location; the requirements which must be complied with by the railroad; the reasons for said findings, conclusions and orders and a reasonable period of time in which the order must be complied with.

(c) *Factors to be considered.* In determining whether or not a particular railroad grade crossing as aforementioned, creates a condition that reasonably requires further protection, and in determining which warning or safety measure, if any, set forth in 15(a) hereinabove shall be provided by the railroad company at a particular location, the Director of Traffic shall give consideration to the following:

(1) The number of tracks involved at the particular location;

(2) The usual or general speed of the rolling equipment operated over the tracks at the particular location;

(3) The number and frequency of trains or other rolling equipment operated over the tracks at the particular location;

(4) The type or character of the neighborhood surrounding the particular location;

(5) The volume and type of vehicular and pedestrian traffic using the street or highway at the particular location at various times;

(6) The transportation requirements and facilities;

(7) The topography of the surrounding land, and the grade, width, course and location of the railroad tracks and the street or highway, at the particular location;

(8) The existence of any signalling, warning or safety device or devices which have been constructed, installed or placed by the railroad company at the particular location;

(9) The number and character of collisions that have occurred at the particular location; and

(10) Any other pertinent facts or matters."

Hugo Liem, Jr. showed that he, as the Commissioner involved, did not keep the records nor make the studies required by the ordinance. If he had kept the required records and made the required studies· the expert testimony shows that a different warning device should have been installed.

The City further argues that, assuming there was a violation of the ordinance, the evidence was legally insufficient to show that the violation of the ordinance was the proximate cause of the injury. The City relies primarily upon *Austin v. Buettner,* 211 Md. 61, 124 A.2d 793 (1956), *Bloom v. Good Humor Ice Cream Co.,* 179 Md. 384, 18 A.2d 592 (1941) and *Peterson v. Underwood,* 258 Md. 9, 264 A.2d 851 (1970) in which the Court said:

> "Proximate cause ultimately involves a conclusion that someone will be held legally responsible for the consequences of an act or omission. This determination is subject to considerations of fairness or social policy as well as mere causation. Thus, although an injury might not have occurred 'but for' an antecedent act of the defendant, liability may not be imposed if for example the negligence of one person is merely passive and potential, while the negligence of another is the moving and effective cause of the injury. *Bloom v. Good Humor Ice Cream Co.,* 179 Md. 384, 18 A.2d 592 (1941), or if the injury is so remote in time and space from· defendant's original negligence that another's negligence intervenes. *Dersookian v. Helmick,* 256 Md. 627, 261 A.2d 472 (1970); *Liberto v. Holfeldt,* 221 Md. 62, 155 A.2d 698 (1959)." 258 Md. at 16.

On the other hand, the appellee argues and we agree that in this case the question of proximate cause was for the jury as a strictly factual question under *Otis Elevator v. Lepore,* 229 Md. 52, 181 A.2d 659 (1962), in which the Court quoted from Prosser, *Torts* (2d ed.) § 44:

> "When a child is drowned in a swimming pool, no one can say with certainty that a life guard would have saved him; but the experience of the community

permits the conclusion that the absence of the guard played a significant part in the drowning. Such questions are peculiarly for the jury; and whether proper construction of a building would have withstood an earthquake, or whether reasonable police precautions would have prevented a boy from shooting the plaintiff in the eye with an airgun, are questions on which a court can seldom rule as a matter of law." 229 Md. at 58-59.

It seems to us the City was an active participant in the injury because of its failure to require a signaling device that would have notified Mr. Seidel not only that there were railroad tracks at the intersection, which he obviously knew, but that a train was actually approaching at the moment he was attempting to cross the tracks.[3] We see no public policy, such as remoteness, which would preclude liability as in the cases relied upon by the appellant.

## II Jury Instructions

Appellant argues that the judge erred by not including the words "proximate cause" in the jury instructions. The City requested that the trial court instruct the jury as follows:

"If you find that there was evidence of a violation of the ordinance that has been read to you in this case, you must then decide if the violation of the ordinance was the proximate cause of the plaintiff's injuries.

If you do not find that the evidence shows that the violation of the ordinance was the proximate cause of the plaintiff's injury then your verdict must be for Defendant."

The trial judge gave the following instructions:

"The violation of a statute or an ordinance which is a cause of the injuries is evidence of negligence. In other words, if someone violates a statute or an

3. In making our determination we are required to accept his testimony that the train was unlighted and made no audible sound.

ordinance and the violation of that ordinance or statute is a cause of the injury that was complained of, then the violation of the statute is evidence of negligence." [4]

Proximate cause, as we have indicated, can be merely a factual question as to cause or it can be the limitation which the courts have placed upon the actor's responsibility for the consequences of his conduct. W. Prosser, *Handbook of the Law of Torts* (4th ed. 1971) § 41.

"The word 'proximate' is a legacy of Lord Chancellor Bacon, who in his time committed other sins. The word means nothing more than near or immediate; and when it was first taken up by the courts it had connotations of proximity in time and space which have long since disappeared. It is an unfortunate word, which places an entirely wrong emphasis upon the factor of physical or mechanical closeness. For this reason 'legal cause' or perhaps even 'responsible cause' would be a more appropriate term." W. Prosser, *Handbook of the Law of Torts* (4th ed. 1971) § 42.

As the Court of Appeals stated in *Peterson v. Underwood, supra:*

"It should be clarified at this point that our inquiry is directed specifically to the issue of 'causation in fact' which has been regarded as an aspect of 'proximate cause.' W. Prosser, *Handbook of the Law of Torts,* § 41, at 240 (3d ed. 1964), 2 F. Harper and F. James, *The Law of Torts,* § 20.2, at 1110 (1956)." 258 Md. at 16.

As we have said, if the Director had kept the required records and made the required studies, he should have determined that a different type of warning signal was necessary at the intersection. The word, "proximate" in the jury instructions was unnecessary because the instructions did say the jury

4. Md. Pattern Jury Instruction 15:3 (1977).

must find that the violation of the ordinance was a "cause" of the accident, and all the jury was concerned with was the factual, not the policy determination.

### III Governmental Function

Appellants argue that the City is immune from liability because the placing of warning signs is a governmental function. It is established in Maryland that a municipality is immune from actions done pursuant to its governmental functions and not its proprietary or corporate functions. *Katz v. Washington Suburban Sanitary Commission,* 284 Md. 503, 508, 397 A.2d 1027, 1030 (1979); *Godwin v. County Commissioners of St. Mary's County,* 256 Md. 326, 334, 335, 260 A.2d 295, 299 (1970).

In *Mayor and City Council of Baltimore v. Thompson,* 171 Md. 460, 467, 189 A. 822 (1936), the Court stated:

> "It needs no authority to support the proposition that the municipality is under the duty of exercising reasonable care to keep its public highways safe for public travel . . ."

In *Gordon v. Howard County,* 13 Md. App. 42, 280 A.2d 906 (1971), this Court stated the rule with reference to signs along a highway as follows:

> "It appears from the general tenor of these authorities cited with approval by the Court of Appeals that in order to impose a legal duty upon a municipality to post warning signs along its highways or to take other precautionary measures to guard the safety of members of the public using such public ways, the existing hazardous condition must be indeed unusual and extraordinary in nature. Furthermore in accordance with the rule enunciated in *Birckhead v. Baltimore* [174 Md. 32, 197 A. 615], at p. 38, the dangerous condition 'must be such as would create a reasonable probability of an accident occurring to a traveler.'" 13 Md. App. at 48-9.

In the instant case the expert testimony was sufficient to show a hazardous condition existed at the railroad crossing

which created a reasonable probability of an accident occurring to a traveller. Because the placing of warning signs on public highways is a proprietary or corporate function, the City is not immune from suit.

*Judgment affirmed.*
*Appellant to pay the costs.*