497 A.2d 159

Sterling **LEESE, Jr.**

v.

**BALTIMORE COUNTY, et al.**

**No. 1599, Sept. Term, 1984.**

Court of Special Appeals of Maryland.

Sept. 9, 1985.

444

**446**

448

J. Carroll Holzer, Towson (Holzer, Maher & Demilio, Towson, on brief), for appellant.

L. Paul Snyder, Jr., Asst. County Atty., Towson (Malcolm F. Spicer, Jr., County Atty., Towson, on brief), for appellees.

Argued before GARRITY, ADKINS and GETTY,* JJ.

ADKINS, Judge.

This case had its genesis in the circumstances surrounding Baltimore County's decision to terminate the employment of the appellant, Sterling Leese, Jr., as the director of its senior citizen transportation network. After his dismissal, Leese brought suit against the appellees—the county and several of its supervisory employees—alleging a number of constitutional and common law infractions. To this initial declaration, the court below sustained a demurrer. Leese filed a thirty-two page amended declaration. That was dismissed for failure to state a claim upon which relief could be granted. Leese appealed. Here, he argues that the lower court erred in granting the motion to dismiss his multi-count amended declaration. We agree in part and reverse.

## FACTUAL BACKGROUND

According to the well-pleaded facts in his amended declaration, Leese was employed by appellee Baltimore County from August of 1976 until October of 1982. During that period, he planned, implemented and managed the county's "Senioride" program. At the outset, the Senioride program was administered under the county's Department of Social Services. In 1979, however, it was assigned to the newly-created Department of Aging. This brought Leese into contact with appellee Timothy Fagan, the Director of the Department of Aging.

---

* Judge Getty participated in the hearing and conferencing of this case but retired before the opinion was filed.

Throughout his tenure as the director of Senioride Leese's position was classified as "part time." Under the county's merit system, part-time employees were expressly denied tenure or any of the other legal protections accorded merit employees. In an effort to obtain the benefits of the merit system, Leese was successful in persuading Fagan to create a new position, designated "Senior Affairs Associate II (Supervisor Senioride Services)." Because this new position conferred full-time merit status, it had to be filled according to the procedures set forth in the county code and regulations. Specifically, the position had to be posted and a test had to be given. Those who cleared these first two hurdles were interviewed by the hiring authority. In this case the hiring authority was Timothy Fagan.

Leese successfully completed the first two steps: he met the criteria in the posting and he achieved the highest score on the exam. At this point, his application, along with others, was forwarded to the hiring authority for an interview. Rather than conducting the interviews himself, Fagan delegated this chore to a panel of supervisory employees: appellees Ellen Yerman, Majorie Fortner, and Gloria Albinok.

Instead of receiving the fair interview that he claims he was due under the Baltimore County Administrative Code and Regulations, Leese asserts that his interview was a sham. In the words of his amended declaration, "the Selection Committee ... and the Director of Aging were predisposed to eliminate [Leese] as a candidate for the merit system position as a result of personal bias and without official and reasonable justification." He further asserts that the "Committee established a different standard to judge [him] during the oral interview, than was used to judge the other candidates, all to [his] prejudice."

This tainted interviewing procedure, Leese asserts, was incorporated in a report to Fagan that stated that Leese "has not demonstrated ability to assume a professional management role beyond daily operations." Acting upon

this report, Fagan and the "ultimate Appointing Officer," B. Melvin Cole, directed that someone other than Leese be selected to fill the merit position. Nevertheless, Leese was retained in a new non-merit part-time position, at a reduced salary, "in which he [was] responsible for continuing his duties of day to day operation of the Senioride Program as well as additional responsibilities."

The decision not to place Leese in the merit position prompted him to challenge the propriety of the hiring process. He retained counsel and began the steps necessary to appeal the decision. Shortly after his attorney contacted Fagan and informed him of the basis for this challenge, Leese was summarily fired. The amended declaration averred that this occurred in "retaliation for exercising his legal rights to appeal" the decision to hire someone other than Leese.

In spite of his dismissal, Leese pursued his administrative appeal of the hiring decision. The matter was first brought before Administrative Officer B. Melvin Cole. When he found no impropriety with the hiring process, a further appeal was taken to the Personnel and Salary Advisory Board of Baltimore County. In an evenly-split decision (2–2), the Board upheld the hiring process.

Undaunted by his lack of success with his administrative appeals, Leese filed a nine-count declaration in the Circuit Court for Baltimore County. The first three counts focused on procedural improprieties in the hearing before the personnel board. Counts IV and VII alleged that the tainted review of Leese's credentials violated the county charter, code, and administrative regulations and thereby denied Leese due process of law under the Fourteenth Amendment to the United States Constitution. Similarly, in counts V and VIII, Leese asserted that he was denied due process when his employment was summarily terminated, and that his dismissal was an unconstitutional retaliation to the exercise of his First Amendment rights. He also averred that these claims amounted to an abusive discharge under

Maryland's common law. Counts VI and IX alleged that Leese was defamed by critical statements that were placed in his personnel records.[1]

When a demurrer to this initial pleading was sustained with leave to amend, the appellant filed an "amended declaration." [2] This pleading included counts I through IX from the initial declaration and added claims for violations of 42 U.S.C. § 1983 and a claim for intentional infliction of emotional distress. To this amended declaration, the trial court granted a motion to dismiss and entered judgment in favor of the appellees.

## ISSUES

Before addressing the many questions presented by this case, it is important to define precisely what the issues are. In doing this, we are cognizant that this case is before us to review a dismissal for failure to state a claim upon which relief can be granted. Accordingly, we must assume that the facts alleged in the amended declaration are true. *Ungar v. State,* 63 Md.App. 472, 479, 492 A.2d 1336 (1985). Also, in conducting our review of the record, we look only to see if the amended declaration truly represented a "failure to state a claim upon which relief can be granted." Md.Rule 2–322(b)(2). In other words, we shall look to see if Leese has alleged facts which, if proven, would entitle him

---

1. In each of the paired counts, the lower numbered count named the county as a defendant; the higher numbered counts sued the supervisory employees.

2. We note that this second declaration was filed after the new Maryland Rules had taken effect. Under the new rules, the initial pleading is titled a "complaint," not a "declaration." Md.Rule 2–302. Additionally, the new rules command that "[a]ll averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances." Md.Rule 2–303(a). Many of the amended declaration's long-winded paragraphs are anything but a "single set of circumstances." Were this the trial court, a motion to strike this defective pleading would be in order. Md.Rule 2–322(e). But, since the issue was not raised below, we shall not address it here. Md.Rule 1085.

to relief. *Dick v. Mercantile-Safe Dep. and Trust Co.*, 63 Md.App. 270, 273, 492 A.2d 674 (1985).

With this in mind, we believe that the following issues have been properly preserved and presented: [3]

I. Due Process/42 U.S.C. § 1983

Has Leese alleged facts sufficient to show that:

A. In light of the Baltimore County Code and its accompanying rules and regulations he had a due process right to a fair appraisal of his qualifications for a merit system position?

B. Under the due process clause of the Fourteenth Amendment to the U.S. Constitution, he, as a part-time non-merit status employee, had a proprietary interest in his continued employment?

C. By including in his personnel file allegedly false statements about his performance as a manager, the appellees stigmatized the appellant so as to deprive him of liberty without due process of law?

II. First Amendment/42 U.S.C. § 1983

Has Leese alleged facts sufficient to show that the county unconstitutionally fired him in retaliation for exercising his First Amendment rights?

III. Abusive Discharge

Has the appellant sufficiently alleged all the elements of an abusive discharge?

IV. Emotional Distress

A. Do the allegations concerning the appellee's conduct with regard to the appellant sufficiently charge extreme and outrageous behavior?

B. Are the injuries alleged to have been suffered by the appellant sufficiently severe?

---

**3.** The issues raised in the first three counts of the amended complaint have not been raised on appeal and are not before us. *See Jacober v. High Hill Realty, Inc.*, 22 Md.App. 115, 125, 321 A.2d 838 (1974).

V. Defamation

 A. Has the appellant adequately alleged that the statements about his work performance were defamatory and published, and that they have caused him actual injury?

 B. Are the defamatory remarks privileged?

VI. Immunities

 A. Are the common law tort and contract claims against the county barred by governmental immunity?

 B. Are the common law tort and contract claims against the county employees barred by Maryland's common law public official immunity?

 C. Are the constitutional claims incorporated in the 42 U.S.C. § 1983 claim barred by the official immunities?

VII. Punitive Damages

Are punitive damages recoverable if the appellant ultimately prevails on the claims that must be remanded?

### I. *Due Process/42 U.S.C. § 1983*

The bulk of the appellant's disagreement with the lower court's decision focuses upon its unwillingness to allow him to challenge the constitutionality of the appellee's hiring and firing decisions. Pleading his case under both the common law [4] and 42 U.S.C. § 1983 [5] Leese asserted that

---

**4.** *Widgeon v. Eastern Shore Hosp. Center,* 300 Md. 520, 479 A.2d 921 (1984) recognized that a common law cause of action exists for both violations of the U.S. Constitution and its Maryland counterpart. Since the appellant has not raised the applicability of any provision of the Maryland Constitution to the facts of this case, we shall confine our decision solely to matters of federal constitutional law. For an interesting discussion of "constitutional" causes of action available to federal employees, *see* Smith, "Bivens Actions for Federal Employees in the Aftermath of *Bush v. Lucas:* Which Remedies for Whom?" 14 U. of Balt.L.Rev. 413 (1985).

**5.** 42 U.S.C. § 1983 provides in pertinent part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution

each of these employment decisions was made without according him the notice and hearing he believes were guaranteed him under the due process clause of the Fourteenth Amendment.

■ Before the appellant can be allowed to proceed with either his common law or § 1983 action, it must appear that there has been a violation of the Fourteenth Amendment by the appellees. In other words, the amended declaration must have alleged that the appellees deprived the appellant of "life, liberty or property, without due process of law." U.S. Const. Amendment XIV. Unless we are able to find that Leese has alleged that he was deprived of one of these predicate interests, his due process claims have no merit. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972).

### A.1. *Property Interest*

As the United States Supreme Court recently reaffirmed, "[p]roperty interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" *Cleveland Board of Education v. Loudermill,* —— U.S. ——, ——, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985) (quoting *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709). But, "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether the interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Steinberg v. Elkins,* 470 F.Supp. 1024, 1030 (D.Md.1979) (quoting *Memphis Light, Gas & Water Division v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978)).

■ In the context of an employment setting, a property interest is defined as "more than [an employee's] abstract

---

and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

need or desire [for the position]. He must have more than a unilateral expectation of it. He must, instead, have a *legitimate claim of entitlement to it." Roth,* 408 U.S. at 577, 92 S.Ct. at 2709 [emphasis supplied]. To show this is seldom a simple task for the employee because, at common law, "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party." *Adler v. American Standard Corp.,* 291 Md. 31, 35, 432 A.2d 464 (1981). *See also Cafeterial & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 896, 81 S.Ct. 1743, 1749, 6 L.Ed.2d 1230 (1961) ("government employment in the absence of legislation can be revoked at the will of the appointing officer"). Accordingly, a property interest ordinarily can be said to exist only when there is a guarantee of continued employment or promotion. *See Andre v. Montgomery County Personnel Board,* 37 Md.App. 48, 63–64, 375 A.2d 1149 (1977).

### A.2. *Property Interest in Merit Position*

Turning to the appellant's contention that he had a property interest in being appointed to the merit position, we cannot find any allegation in his amended declaration that he was entitled to the merit position. Nor do we believe that under the Baltimore County merit system it would have been possible for the county government to guarantee a position to any applicant for employment. Indeed, as the appellant contends in his challenge to the selection process, the code and its accompanying regulations command that the selection process focus upon the merits of each candidate's qualifications.

Leese apparently concedes that he was not guaranteed the merit position. He argues that although he was not entitled to the position itself, he was entitled to have his qualifications reviewed in the impartial manner set forth in the county code and regulations.

In *Andre* this court was confronted with a nearly identical claim. There, teachers had been denied pro-

motions because the hiring authority had allegedly "ignored, bent or twisted the personnel lists to suit his own whim." 37 Md.App. at 58, 375 A.2d 1149. Rejecting the due process argument, we recognized that "[t]he County Code procedure for promotion is merely procedure and not, as appellants would like, a guarantee of promotion." *Id.* at 64, 375 A.2d 1149. Leese's due process challenge to the hiring process must fail for the same reason. The ultimate decision to fill the merit position was discretionary, and he has not alleged any facts that would show that the hiring procedures required the discretion be exercised in his favor. *See McFarlane v. Grasso*, 696 F.2d 217, 222 (2d Cir.1982). *And see Bigby v. Chicago*, 766 F.2d 1053 (7th Cir.1985) (police sergeant has no property interest in promotion to lieutenant). Thus, the county's personnel rules and regulations do not confer the property interest needed to trigger the protections of due process.

### B. *Property Interest in Part-Time Position*

■ Leese also asserts that he had a property interest in continued employment as a part-time employee. To prove this claim, Leese would have had to show that "there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972). These rules and understandings need not be set forth in written policies or regulations. Rather, as the court recognized in *Perry*, "the law of contracts in most, if not all, jurisdictions long has employed a process by which agreements, though not formalized in writing, may be 'implied.'" *Id.* at 601–02, 92 S.Ct. at 2700 (quoting 3 A. Corbin, *Corbin on Contracts* §§ 561–72A (1960)). *See also Staggs v. Blue Cross of Maryland, Inc.*, 61 Md.App. 381, 388–92, 486 A.2d 798, *cert. denied*, 303 Md. 295, 493 A.2d 349 (1985) (employer's written policy statements can become basis for breach of contract action).

Seizing upon this language, Leese attempts to generate an issue of fact over whether the county's dealings with

him amounted to a contract that "he would not be dismissed unless he failed to perform his job duties as required and that he had protection and security." The appellant's contentions overlook the combined operation of the Baltimore County Charter, Code and Rules and Regulations. Under the charter, a classified and an exempted service are created. Baltimore County Charter § 801 (1978). The code provides that only members of the classified service are accorded full merit status, including protection against dismissal without cause. Baltimore County Code 21–14. See also § 21–21, Rule 15 (creating protections against dismissal for "[a]ny member of the classified service"). In sharp contrast to the ample job security granted merit employees, part-time employees are expressly excluded from "merit system status." Rule 8.01. *See also* Rule 8.04 (stating that "[e]mployees serving in emergency, temporary or provisional appointments ... may be dismissed from their jobs at any time").[6] Accordingly, any argument that Leese was given job security under the charter, code or regulations is frivolous.

Perhaps on rare occasions an employee may be able to show that, in spite of non-merit status, the realities of the workplace are such that an informal tenure system exists. *Steinberg v. Elkins*, 470 F.Supp. 1024, 1029 (D.Md.1979). In *Perry*, for instance, the court held that a faculty guide which contained the following paragraph conferred *de facto* tenure:

> *Teacher Tenure:* Odessa College has no tenure system. The Administration of the College wishes the faculty member to feel that he has permanent tenure as long as his teaching services are satisfactory and as long as he

---

6. Rule 8.04 does not mention part-time employees. But the express exclusion of part-time employees from the merit system in Rule 8.01 negates any inference that a part-time employee has more job security than the positions listed in Rule 8.04. Absent a code provision or regulation guaranteeing job security, the part-time employee is still an employee at will.

displays a cooperative attitude toward his co-workers and his superiors, and as long as he is happy in his work. 408 U.S. at 600, 92 S.Ct. at 2699. *See also Steinberg,* 470 F.Supp. at 1027–28 (faculty committee voted to grant professor tenure without taking the necessary step of obtaining administration approval).

■ Unlike the faculty member in *Perry,* the appellant can point to no specific employer-authored policy statement that conferred any job security. Nor has he alleged that any actions were taken by the appellees to confer such status. Thus, much like the untenured faculty member in *Roth,* the appellant had only "an abstract concern" in retaining his position with Baltimore County. 408 U.S. at 578, 92 S.Ct. at 2710. Hence, his property interest claims must fail.

## C. *Liberty Interest*

"Liberty," as incorporated in the Fourteenth Amendment of the U.S. Constitution, is a concept that defies efforts to contain it within a precise definition. In an employment setting, a liberty interest has been recognized when the dismissal "imposed upon [the employee] some stigma or disability that forecloses other employment opportunities." *Elliott v. Kupferman,* 58 Md.App. 510, 519, 473 A.2d 960 (1984). *See also Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. The reason for recognizing a liberty interest in this instance was explained by the Supreme Court long ago: "[i]t requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that was the purpose of the [Fourteenth] Amendment to secure." *Truax v. Raich,* 239 U.S. 33, 41, 36 S.Ct. 7, 10, 60 L.Ed. 131 (1915), *quoted in In Re Griffiths,* 413 U.S. 717, 720, 93 S.Ct. 2851, 2854, 37 L.Ed.2d 910 (1973).

■ To invoke this liberty interest, the terminated employee must show that his former employer has published false statements about him. *Cleveland Board of Edu-*

*cation v. Loudermill,* —— U.S. ——, —— n. 13, 105 S.Ct. 1487, 1496 n. 13, 84 L.Ed.2d 494 (1985) ("the failure to allege that the reasons for the dismissal were published dooms [the] claim"); *Codd v. Velger,* 429 U.S. 624, 627–28, 97 S.Ct. 882, 883–84, 51 L.Ed.2d 92 (1977) (per curiam) (must allege that stigmatizing information was false). He must also show that these untruths are preventing him from securing similar employment. *Roth,* 408 U.S. at 574 n. 13, 92 S.Ct. at 2707 n. 13. Lastly, it must appear that the false information was of such a stigmatizing nature that it virtually "foreclosed his freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707.

Examining these elements in reverse order, we note that Leese asserts that he has been "stigmatized" because the appellees branded him as "not having demonstrated ability to assume a professional management role beyond daily operations." He also claims to have been stigmatized by the inclusion of a "termination ticket" which states that "due to the employee's work history, the level and scope of positions for which he is eligible are restricted." We believe that he misreads the proper definition of the term "stigmatize."

In recognizing that an employee has a liberty interest in being able to find future employment, the Supreme Court did not create a constitutional cause of action against every employer or supervisor who gives an employee an unfavorable review. The *Roth* court speaks in terms of a stigma that is so disabling that it virtually forecloses other employment opportunities. 408 U.S. at 573–74, 92 S.Ct. at 2707–08. *See also Bigby v. Chicago, supra,* and *Russell v. Hodges,* 470 F.2d 212, 217 (2d Cir.1972); *Smith v. Bd. of Education,* 708 F.2d 258, 265–66 (7th Cir.1983).

In determining a stigmatizing dismissal from its nonstigmatizing counterpart, the focus is "upon the charge used as grounds for termination and not the actual consequence of the charge." *Stretten v. Wadsworth Veterans*

*Hosp.*, 537 F.2d 361, 365 (9th Cir.1976). Thus, mere non-retention, without a statement of the reason behind it, is not sufficiently stigmatizing. *Roth*, 408 U.S. at 574 n. 13, 92 S.Ct. at 2707 n. 13. Also, when given, the reasons for the dismissal must contain "something considerably graver than a charge of failure to perform a particular job." *Russell*, 470 F.2d at 217. Indeed, they must impute some sort of "dishonesty, immorality, pressure to drop criminal charges, intoxication and the like." *Smith*, 708 F.2d at 266 n. 6. *See also Roth*, 408 U.S. at 573, 92 S.Ct. at 2707 (dismissal based on charges that an employee "had been guilty of dishonesty, or immorality" would be be sufficiently stigmatizing). Thus, false statements that merely offer evaluation of an employee's work performance do not violate a liberty interest. *See Munson v. Friske*, 754 F.2d 683, 693 (7th Cir.1985) (employee disobeyed orders); *Hadley v. County of DuPage*, 715 F.2d 1238 (7th Cir.1983) (mismanagement), *cert. denied*, — U.S. ——, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984); *Gray v. Union Intermediate County Education District*, 520 F.2d 803, 806 (9th Cir.1975) (insubordination, incompetence hostility toward others); *Blair v. Board of Regents*, 496 F.2d 322, 324 (6th Cir.1974) (failure to meet minimum professional standards).

Explaining this often difficult distinction, the *Stretten* court offered the following guidance:

> The 'liberty interest' is the interest an individual has in being free to move about, live, and practice his profession without the burden of an unjustified label of infamy. *Board of Regents v. Roth*, 408 U.S. at 572, 92 S.Ct. at 2706, 33 L.Ed.2d at 557. In the context of *Roth*-type cases, a charge which infringes one's liberty can be characterized as an accusation or label given the individual by his employer which belittles his worth and dignity as an individual and, as a consequence is likely to have severe repercussions outside of professional life. Liberty is not infringed by a label of incompetence, the repercussions of which primarily affect professional life, and which may well force the individual down one or more

notches in the professional hierarchy. The distinction is not perfect; our utility affects our dignity and worth whether viewed from within or without. However, implicit in such a distinction is the notion that the constitutional need for procedural protection is not strong when the charge (*e.g.* incompetence) involves a matter which is peculiarly within the scope of employer-employee relations and when the likely results of even a false charge are reduced economic returns and diminished prestige, but not permanent exclusion from, or protracted interruption of, gainful employment within the trade or profession.[7]

537 F.2d at 366.

■ Nowhere in his amended declaration does Leese assert that he has been labeled dishonest or immoral. Rather, the questioned personnel records merely comment on his lack of ability to perform a particular job. This is, as a matter of law, insufficient, under the authorities cited above, to trigger a liberty interest. Since we find that the appellant has not alleged facts that show he has been sufficiently stigmatized, we need not review the other elements. He has not shown that his liberty interest in future employment has been abridged.

## II. *First Amendment/42 U.S.C. § 1983*

■ Although the previous discussion shows that the employment at will doctrine is alive and well in Maryland, there are certain constitutional limitations on the government's authority to fire its employees. As the Supreme Court has recognized, "the theory that public employment

---

7. As the authorities cited show, a stigmatizing statement must include a very high order of derogation. Lesser adverse commentary may not be stigmatizing for due process deprivation purposes, even though it may be defamatory at common law. *See* Part V of this opinion. But there is no constitutional doctrine that "converts every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the ... Fourteenth Amendment." *Paul v. Davis,* 424 U.S. 693, 702, 96 S.Ct. 1155, 1161, 47 L.Ed.2d 405 (1976).

which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents,* 385 U.S. 589, 605–06, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967). Specifically, when an employee exercises his First Amendment rights to speak on matters of public concern, he cannot be dismissed in retaliation for having exercised his rights. *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983); *DeBleecker v. Montgomery County,* 292 Md. 498, 506–07, 438 A.2d 1348 (1982).[8] To rule otherwise would allow the government to accomplish indirectly what it cannot do directly: silence protected speech. *Perry,* 408 U.S. at 597, 92 S.Ct. at 2697.

■ To establish a claim based on the First Amendment, the discharged employee must prove two elements. First, he must show that he was engaging in constitutionally-protected speech at the time of his discharge. *DiGrazia v. County Executive for Montgomery County,* 288 Md. 437, 447–52, 418 A.2d 1191 (1980). Second, he must show that "his conduct was a ... 'motivating factor' in the [employer's] decision to [fire]." *Mt. Healthy City School District Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). We believe that Leese has alleged sufficient facts to meet both of these prerequisites.

■ The protected First Amendment freedom that is alleged to have prompted his dismissal was his decision to contest what he believed was an unfair hiring process. This was an exercise of his First Amendment right to petition

---

**8.** A dismissal in retaliation for exercising one's First Amendment rights also triggers a liberty interest for purposes of invoking the due process protections under the Fourteenth Amendment. *Elliott,* 58 Md.App. at 519, 473 A.2d 960. The remedies available for the violation of each of these separate constitutional provisions can be quite different. Under the due process clause the employee is entitled only to notice and an opportunity to be heard. For the violation of First Amendment, the employer's decision is deemed to be unlawful, regardless of how much due process it accorded the dismissed employee.

government for redress of grievances.[9] *See McDonald v. Smith*, —— U.S. ——, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985); *Miner v. Novotny*, 60 Md.App. 124, 481 A.2d 508 (1984), *cert. granted*, 302 Md. 239, 486 A.2d 1196 (1985).[10] As we noted in *Miner*, "[t]he petition privilege is among our most precious liberties." *Id.* at 129, 481 A.2d 508. We recognize, though, that occasionally the demands of the employer/employee relationship will allow the government employer to exert more control over an employee's exercise of his constitutional rights than it could over an ordinary citizen. *See Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968); *DiGrazia*, 288 Md. at 449, 418 A.2d 1191. But, if the employee's First Amendment rights are to have any value, the employer cannot rely upon the need of the work place to justify a dismissal engineered to suppress criticism on matters of public concern. *Tortman v. Board of Trustees*, 635 F.2d 216, 229 (3d Cir.1980), *cert. denied sub nom.*, *Lincoln University v. Trotman*, 451 U.S. 986, 101 S.Ct. 2320, 68 L.Ed.2d 844 (1981). *See also Perry*, 408 U.S. at 597–98, 92 S.Ct. at 2697–98 (faculty member unlawfully fired for testifying before a committee of the Texas state legislature).[11]

---

**9.** The appellant confines his argument to the right to petition. We note, however, that the communications of information to the county's personnel review board was also an exercise of the First Amendment right to freedom of speech. *See DeBleeker*, 292 Md. 507–10, 438 A.2d 1348.

**10.** In *Sherrard v. Hull*, 53 Md.App. 553, 456 A.2d 59, *aff'd*, 296 Md. 189, 460 A.2d 601 (1983) and its progeny the First Amendment right to petition government for the redress of grievances was viewed as one having a specially protected status under the First Amendment. The *McDonald* court, to the contrary, held that the petition right should be treated on the same basis as other First Amendment rights. That does not affect the result in this case. The right to petition remains a First Amendment right. As such, its exercise, standing alone, cannot form the basis for a dismissal.

**11.** Since this case arrives in this court to review a granted motion to dismiss an amended declaration, the defenses associated with the needs of the workplace have not yet been placed in issue; nor have they been raised by the parties in either their briefs or at oral

In what is perhaps inartful pleading, Leese asserted that his discharge "was not prompted by a genuine dissatisfaction as to his performance as an employee, but was motivated by retaliation for exercising his legal right to appeal." In making this allegation, the appellant has sufficiently alleged "statements of fact as may be necessary to show the pleader's entitlement to relief." Md.Rule 2–303(b). The amended declaration in substance charges that Leese was dismissed because he exercised his right to petition the government for redress of a grievance.

 Although the appellant's exercise of the petition right was a valid exercise of a constitutional right, it cannot serve as a basis for overturning his dismissal unless it touched upon a matter of "public concern." *Connick v. Myers,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91. In other words it must relate "to any matter of political, social, or other concern of the community ... [such as] to bring to light actual or potential wrongdoings or breach of public trust on the part of [government officials]." *Id.* at 146–48, 103 S.Ct. at 1689–91. When it relates to "speech solely in the individual interest of the speaker and [his] specific business audience," *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* —— U.S. ——, ——, 105 S.Ct. 2939, 2947, 86 L.Ed.2d 593 (1985), the Supreme Court has determined that "government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick,* 461 U.S. at 146, 103 S.Ct. at 1689. To determine whether the exercise of the petition right addressed a matter of public concern we must look to its "content, form, and context ... as revealed by the record as a whole." *Dun & Bradstreet, Inc.,* —— U.S. at ——, 105 S.Ct. at 2947 (quoting *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91).

---

argument. Accordingly, we do not decide the issue here. Md.Rule 1085.

Looking first to the content of Leese's petition, it is clear that he has alleged serious violations of the county's merit system. It is indisputably in the public's interest to be kept abreast of such serious improprieties in the methods used to select its civil servants. At the very least, the misuse of the hiring power by public officials represents a "breach of public trust." *Connick,* 461 U.S. at 148, 103 S.Ct. at 1690. The form and context chosen by the appellant to exercise the petition privilege strengthen our conclusion that he was addressing a matter of public concern. Rather than airing his view privately, he challenged the hiring process by appealing administratively twice and by litigating this case in court. In short, he was engaging in a protected exercise of his First Amendment rights when he was dismissed.

Lastly, by alleging that the termination was motivated by the exercise of the petition privilege, Leese has adequately alleged that his challenge to the hiring process was a motivating factor in the appellees' decision to dismiss him. Thus, he has set forth facts to state a cause of action for violations of the First and Fourteenth Amendments. And by charging that his retaliatory discharge was effected by application of county laws and regulations, he has charged a violation of § 1983. *See* footnote 8. If Leese can prove these facts at trial, the burden will shift to the appellees to show that the appellant would have been dismissed, regardless of his exercise of the petition privilege, *DiGrazia,* 288 Md. at 448, 418 A.2d 1191, as well as to show any justifying work-place factor.

### III. *Abusive Discharge*

In addition to his constitutional challenges, Leese also asserts that his firing amounted to an abusive discharge under Maryland's common law. Specifically, his cause of action for abusive discharge "is grounded and based upon a breach of contractual rights and duties owed to him by the [appellees]." Recent decisions indicate that a claim for abusive discharge must allege that

1. the employee was discharged;

2. the dismissal violated some clear mandate of public policy; and

3. there is a nexus between the defendants and the decision to fire the employee.

*Moniodis v. Cook,* 64 Md.App. 1, 13–14, 494 A.2d 212 (1985). *See also Staggs v. Blue Cross of Maryland, Inc.,* 61 Md. App. 381, 486 A.2d 798 (discussing the element of discharge), *cert. denied,* 303 Md. 295, 493 A.2d 349 (1985). Absent any one of these elements, "an employment contract of indefinite duration, that is, at will, can be legally terminated at the pleasure of either party at any time." *Adler,* 291 Md. at 35, 432 A.2d 464.

It is clear to us that the appellant has properly pleaded the first two elements. There is no doubt that he was in fact discharged. Moreover, to the extent that this discharge violated Leese's constitutional rights, it was abusive. We can conceive of no clearer "mandate of public policy" than the rights spelled out in the United States Constitution. *See Moniodis,* 64 Md.App. at 10, 494 A.2d 212.

It is considerably less apparent that all the appellees were somehow involved in the decision to fire Leese. Indeed, it is only alleged that Fagan made the decision to terminate him, and it was Fagan who signed the termination letter. Nevertheless, the amended declaration alleged that all the individual appellees, as well as the county, participated in the discharge. Whether this can be proved, particularly as to Yerman, Fortner, and Albinok, may be questioned. *See Moniodis,* 64 Md.App. at 14, 494 A.2d 212. But we are dealing here with pleading, not proof. The amended declaration was sufficient to charge abusive discharge against all the appellees.

#### IV. *Intentional Infliction of Emotional Distress*

In the last count of his amended declaration, the appellant asserted that the appellees "intentionally conspired together" to deny him the merit position and to

terminate his employment.[12] This, he asserts, was without just cause and "for the express purpose of humiliating, embarrassing and causing [the appellant] to endure and experience severe emotional distress and emotional suffering." To state a cause of action for intentional infliction of emotional distress, the appellant's amended declaration must have alleged the following four elements:

(1) The conduct must be intentional or reckless;

(2) The conduct must be extreme and outrageous;

(3) There must be a causal connection between the wrongful conduct and the emotional distress;

(4) The emotional distress must be severe.

*Moniodis,* 64 Md.App. at 15, 494 A.2d 212. We believe that the appellant has failed to allege facts which, if proven, would establish the second and fourth elements.

### A. *Extreme and Outrageous Behavior*

"In determining whether conduct is extreme and outrageous, it should not be considered in a sterile setting, detached from the surroundings in which it occurred." *Harris v. Jones,* 281 Md. 560, 568, 380 A.2d 611 (1977). In *Dick v. Mercantile-Safe Deposit & Trust,* 63 Md.App. 270, 492 A.2d 674 (1985), we recently reviewed what is meant by "extreme and outrageous conduct." There, we determined that it exists "only if 'the average member of the communi-

---

**12.** In making this general allegation, the appellant may be attempting to plead this count under 42 U.S.C. § 1985 (1982). This effort is misplaced. While § 1985(2) has been deemed to apply to cases involving employees who were discharged in retaliation for seeking judicial redress against their employers, *Irizarry v. Quiros,* 722 F.2d 869, 871 (1st Cir.1983), it does not apply to instances where employees have pursued administrative, rather than judicial, redress. *See Hack v. Oxford Health Care, Inc.,* 562 F.Supp. 295, 299 (N.D.Ind.1983). Nor does this case fall within § 1985(3). Plainly, the appellant has not alleged that the conspiracy was motivated by an animus that would bring this case under that subsection. *See Carpenters v. Scott,* 463 U.S. 825, 837–39, 103 S.Ct. 3352, 3360–61, 77 L.Ed.2d 1049 (1983); *Harrison v. KVAT Food Management, Inc.,* 766 F.2d 155 (4th Cir.1985); *Mears v. Oxford,* 762 F.2d 368, 374 (4th Cir.1985); *Munson v. Friske,* 754 F.2d 683, 694–96 (7th Cir.1985).

ty must regard the defendant's conduct ... as being a complete denial of the plaintiff's dignity as a person.' " *Id.* at 276, 492 A.2d 674 (quoting *Alsteen v. Gehl,* 21 Wis.2d 349, 124 N.W.2d 312, 318 (1963)). In *Moniodis,* we had occasion to apply these principles to an alleged abusive discharge. Writing for the court, Judge Weant began his discussion of the issue by noting that "[t]he actors in this case were an employer and a supervisor, and as such their conduct must be 'carefully scrutinized.' " 64 Md.App. at 17, 494 A.2d 212 (quoting *Harris,* 281 Md. at 569, 380 A.2d 611). The other factors that were deemed important in generating a *prima facie* case on the extreme and outrageous issue were that the employers were aware of the employee's sensitive nature, that the charges against her suggested that she was dishonest and that forcing the employee to undergo a lie detector test was in direct violation of her statutory right to refuse to take such a test. *Id.* at 13, 494 A.2d 212.

In *Beye v. Bureau of National Affairs,* 59 Md.App. 642, 477 A.2d 1197, *cert. denied,* 301 Md. 639, 484 A.2d 274 (1984), we held that the following employer excesses did not amount to extreme and outrageous conduct:

(1) for six years, from 1976–1982, Thomas and Shaw gave him poor performance ratings, 'threatened to fire him, harassed him and physically assaulted him'; (2) BNA passed him over for promotion in favor of employees with less seniority and appointed Thomas as his supervisor with knowledge of Thomas's 'prior illegal activity and the efforts of ... Beye to ferret it out and to have it prosecuted'; and (3) Moore deceived him into resigning.

59 Md.App. at 656, 477 A.2d 1197. *See also Continental Casualty v. Mirabile,* 52 Md.App. 387, 449 A.2d 1176, *cert. denied,* 294 Md. 652 (1982) (employer who screamed at employee and moved him from desk to desk held not to have acted in an extreme and outrageous manner).

Here, it is alleged that the appellees were employers and that they acted intentionally. This resembles the situa-

tions in *Moniodis* and *Beye.* What is missing, however, is an allegation that the appellant was overly sensitive to the treatment he received. Nor is it suggested that he was labeled as dishonest or immoral. By denying him a promotion and firing him, the appellees may have acted with a disregard for Leese's emotional well being, but we cannot say that these actions standing alone amount to the "major outrage" of personal dignity that is "essential to the tort." *Continental Casualty,* 52 Md.App. at 404, 449 A.2d 1176 (quoting Restatement (Second) of Torts § 46, comment 5 (1967)).

## B. *Severity of Emotional Distress*

Even if we were to find that the conduct alleged was extreme and outrageous, the amended declaration clearly failed to allege that "the emotional distress [was] severe." *Moniodis,* 64 Md.App. at 15, 494 A.2d 212. To meet this standard, Leese would have had to allege in effect that he suffered " 'a *severely* disabling emotional response,' so acute that 'no reasonable man could be expected to endure it.' " *Id.* (quoting *Harris,* 281 Md. at 571, 380 A.2d 611 [emphasis in original] ). In *Moniodis* Judge Weant also addressed this element in the context of employees who were discharged for refusing to take a lie detector test. Concluding that some of the discharged employees had not suffered sufficiently disabling emotional distress, he noted that they were "quite capable of tending to necessary matters." *Id.* 64 Md.App. at 16, 494 A.2d 212. With regard to one employee, in contrast, he concluded that a sufficiently serious emotional response had been shown.

It appears that Cook took her duties at Rite-Aid quite seriously. When [her supervisor] told her she would be transferred, her hours diminished, and her store keys taken, she was deeply disturbed. Her husband found her at home crying and wringing her hands. There was evidence that she did suffer from a pre-existing nervous condition; her emotional state, however, deteriorated significantly after her termination. She took greater

amounts of medication and began to sleep most of the time. She became a recluse, her husband testified, and did not 'come out of it' for a year. Relatives came to the home to tend to household chores which Ms. Cook could no longer perform. She took pains to avoid contact with neighbors who might ask her why she no longer worked at Rite-Aid.

*Id.*

 Leese's alleged injuries come nowhere near the type of severe emotional distress described above. His amended declaration alleges that he suffered "physical pain, emotional suffering and great mental anguish." This falls short of the "evidentiary particulars" that must be pleaded to show a *prima facie* case of severe injury. *Harris*, 281 Md. at 572. Moreover, it is never alleged that he was unable to tend to necessary matters. Indeed, in several counts he alleges that he has been actively job hunting. Thus, we must conclude that he has not alleged a sufficiently disabling emotional distress to state a cause of action for intentional infliction of emotional distress.

## V. *Defamation*

### A. *Sufficiency of Allegations as to Defamation*

For a complaint alleging libel

to withstand the test of a [motion to dismiss] it must allege:

(1) a false and defamatory communication

 a—which the maker knows is false and knows it defames the other, or

 b—that the maker has acted in reckless disregard of these matters, or

 c—that the maker has acted negligently in failing to ascertain them, and

(2) that the statement was one which appears on its face to be defamatory, as, *e.g.,* a statement that one is a thief,

or the explicit extrinsic facts and innuendo which make the statement defamatory, and

(3) allegations of damages with some particularity, since *Gertz [v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974)] and *Jacron [Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976)] forbid presumed damages.

*Metromedia, Inc. v. Hillman,* 285 Md. 161, 172, 400 A.2d 1117 (1979).

In counts VI and IX of his declaration Leese alleged that appellees placed in his personnel file statements that he "has not demonstrated ability to assume a professional management role beyond daily operations" and that "due to the employees [*sic*] work history, the level and scope of positions for which he is eligible are restricted." Leese further alleged that these statements were untrue, that appellees knew of their falsity and defamatory character, and that they were disseminated to the Department of Aging staff and "with reckless disregard of this knowledge" to prospective employers. According to the declaration, Leese sustained damage "by being rejected for other positions with the [county] as well as not being employed for over a year by any other employer, after said statements became known to said prospective employer." These allegations meet the *Metromedia* standards.

Although publication could have been charged with more clarity, it was sufficiently alleged. So were damages and the known falseness of the statements. The only substantial question pertains to the defamatory nature of the statements.

A statement is defamatory if it exposes "the person [who is the subject of it] to public scorn, hatred, contempt or ridicule and thus injure[s] reputation." *Mareck v. Johns Hopkins University,* 60 Md.App. 217, 223, 482 A.2d 17 (1984) (quoting *Thompson v. Upton,* 218 Md. 433, 437, 146 A.2d 880 (1958), *cert. denied,* 302 Md. 288, 487 A.2d 292 (1985). A written statement is libel *per se* when "the words

themselves impute the defamatory character." *Metromedia*, 285 Md. at 172, 400 A.2d 1117. And it is defamatory "to utter any slander or false tale of another . . . which may impair or hurt his trade or livelyhood." 3 W. Blackstone, *Commentaries on the Laws of England* 123 (special ed. 1983). Thus, a statement "that adversely affects [an employee's] fitness for the proper conduct of his business . . . [is] actionable *per se* at common law." *Hearst Corp. v. Hughes*, 297 Md. 112, 118, 466 A.2d 486 (1983).

This is not to imply, however, that every negative evaluation of an employee's performance is potentially defamatory. Rather, " '[t]he words must go so far as to impute to him some incapacity or lack of due qualification to fill the position.' " *Foley v. Hoffman*, 188 Md. 273, 284, 52 A.2d 476 (1947) (quoting *Kilgour v. Evening Star Co.*, 96 Md. 16, 24–25, 53 A. 716 (1902) quoting *Sillars v. Collier*, 151 Mass. 50, 23 N.E. 723 (1890)). *See also Bowie v. Evening News*, 148 Md. 569, 577, 129 A. 797 (1925) (implying that employee lacks honesty); *Flaks v. Clark*, 143 Md. 377, 122 A. 383 (1923) (had it been alleged that "he managed his said business improperly," it would have been defamatory). In other words, the defamatory statement must be such that "if true, would disqualify him or render him less fit properly to fulfill the duties incident to the special character assumed." *Kilgour v. Evening Star Co.*, 96 Md. 16, 29, 53 A. 716 (1902).

■ Taken in the abstract, neither the statement that Leese had failed to demonstrate ability to assume a professional management role nor the statement that his work history restricted the scope and level of possible future positions was defamatory *per se*. A statement that one has failed to demonstrate ability to assume a professional management role does not in and of itself charge lack of that ability. If the employment in question were of short duration, it might not impute any lack of qualification, but simply a need for more time on the job to develop the requisite ability. And if the job did not in fact involve a

professional management role it might not be derogatory at all. Similarly, the second statement, in and of itself, might have no adverse connotation. For example, if the work history were one of part-time employment at the employee's own request, there would be nothing defamatory about a comment that such a work history limited the scope of possible future hiring. We must, therefore, look for other allegations in the amended declaration in the context of which the statements might be deemed defamatory. In other words, we must look for innuendo that would establish libel *per quod.*

In the declaration Leese claimed he was employed by the county for some six years "to plan, develop and implement a transportation Program for Baltimore County's senior citizens," that he directed the program from its inception, that his employment was in the nature of "professional management" and that "he provided professional management satisfactory to the [county] for six years." If one who has performed professional management services for six years is denied a position because he has failed to demonstrate ability to assume a professional management role, that statement clearly indicates lack of that ability and thus substantially impairs the would-be manager's professional reputation. If that same employee is then discharged with the notation that "the level and scope of positions for which he is qualified are limited" there is an equally damaging effect. The two statements become very like the "[t]his termination is for unsatisfactory performance" that was held defamatory in *Adler v. American Standard Corp.,* 538 F.Supp. 572, 577 (D.Md.1982). Since publication, falsity, and damages were adequately charged, we hold that the amended declaration sufficiently set forth a cause of action in libel *per quod.*

## B. *Privilege*

Appellees argue that, even so, they are protected by a conditional privilege. While the existence of such a privilege is ordinarily a matter of defense, if a defamation

complaint shows on its face the existence of a privilege, the issue may be raised by motion to dismiss.

As we pointed out in *Happy 40, Inc. v. Miller*, 63 Md.App. 24, 31–32, 491 A.2d 1210 (1985), a defamatory statement dealing with reasons for an employee's discharge may be privileged if communicated to fellow-employees or to a recipient (such as a prospective new employer) "who justifiably is entitled to receive it." The publications alleged by Leese were of precisely this sort. But the conditional privilege may be lost if it is abused. *Id.* at 32–33, 491 A.2d 1210. Abuse occurs when the statement is made with 1) a reckless disregard for its truth, 2) it is not made in furtherance of the interest for which the privilege exists, or 3) it is communicated to a third person other than one "whose hearing is reasonably believed to be necessary or useful to the protection of the interest." *Id.* at 32, 491 A.2d 1210 (quoting *Mareck*, 60 Md.App. at 225, 482 A.2d 17). In this case, the appellant has placed the first form of abuse in issue. He did this by alleging that appellees "knew the statements to be false." *Adler*, 538 F.Supp. at 577. While the existence of a privilege is an issue of law, its forfeiture by abuse is an issue of fact. *Happy 40, Inc.*, 63 Md.App. at 34, 491 A.2d 1210. Thus, we hold that the appellant has sufficiently alleged all the elements of defamation. He has also properly pleaded that the appellees forfeited their qualified privilege as employers.

## VI. *Immunities*

Akin to their qualified privilege argument is a more broad-ranging contention appellees make with respect to Leese's constitutional and common law claims. They assert these claims are barred by various immunities, specifically, governmental immunity, public official immunity, and immunity under 42 U.S.C. § 1983. As in the case of qualified privilege in a defamation claim, these immunities are generally matters of defense. *See Tanner v. Hardy*, 764 F.2d 1024 (4th Cir.1985) (§ 1983 "good faith" immunity). But, again as in the case of qualified privilege, if a complaint

shows the potential existence of an immunity on its face, that defense is available on motion to dismiss. Since Leese's amended declaration did so, we address each of the claimed immunities in turn.

### A. *Governmental Immunity*

Imported into this country from English common law, the doctrine of sovereign immunity has survived repeated challenges over the years and remains as a formidable obstacle to those who attempt to sue a governmental entity. *See, e.g., Austin v. Baltimore,* 286 Md. 51, 54–58, 405 A.2d 255 (1979).[13] Not all governmental entities, however, are treated equally. Although the State's former near-complete immunity from all suits in tort and contract has been substantially eroded by statute, State Govt. Art. §§ 12–101 —12–204, municipalities and counties have been traditionally cloaked with a more limited immunity, also (at least in contract) somewhat modified by statute. Since this case involves a suit against a county, the latter must be examined in some depth.

Under Maryland common law "[u]nlike the total immunity from tort liability which the State and its agencies possesses, the immunity of counties, municipalities and local agencies is limited to tortious conduct which occurred in the exercise of a 'governmental' rather than a 'proprietary' function." *Austin,* 286 Md. at 53, 405 A.2d 255. By its terms this standard applies only in tort actions.

Where a county is attempting to assert governmental immunity as a bar to a contract claim, the common law allows it to "abrogate its responsibility under a contract entered into in performance of a governmental function if dictated by the public good." *American Structures, Inc. v. Baltimore,* 278 Md. 356, 359, 364 A.2d 55 (1976). This is not to suggest that counties and municipalities are fully

---

**13.** For a historical sketch of the origins and history of sovereign immunity and the policies supporting it, *see Godwin v. County Commissioners of St. Mary's County,* 256 Md. 326, 330–34, 260 A.2d 295 (1970).

immunized against contractual liability. Rather, they are "answerable in damages incurred to the time of cancellation." *Id.*

This common law contract immunity, however, is limited by statute. Under § 1A, Article 25A, Annotated Code of Maryland, "a chartered county ... may not raise the defense of sovereign immunity ... in an action in contract based upon a written contract executed on behalf of the county or its department, agency, board, commission or unit by an official or employee acting within the scope of his authority." Md.Code Ann. Art. 25A, § 1A(a) (1984 Supp.). *See also* Md.State Gov't Art. § 12–202 (1984); Md.Code Ann. Art. 25, § 1A (1984 Supp.).

 In sum, before governmental immunity can be asserted in either a contract or tort claim, it must appear that the county committed the infraction while it was engaged in a governmental function. And, in a contract case, the bar only applies to damages incurred after the breach of a contract that does not fall within § 1A. With these principles in mind, we turn to Leese's tort and contract claims.

 His amended declaration alleged improprieties in the county's hiring and firing processes. These plainly are governmental functions. *See Tadjer v. Montgomery County,* 300 Md. 539, 546–50, 479 A.2d 1321 (1984). Thus, the common law claims based on the county's alleged tortious conduct are barred by governmental immunity. As counsel conceded at oral argument, this effectively disposes of the defamation and emotional distress claims against the county.

 With regard to abusive discharge, Leese has elected to assert this claim against the county in contract, not in tort. *See Adler,* 291 Md. at 36, 432 A.2d 464, and *Moniodis,* 64 Md.App. at 13, 494 A.2d 212. We note at the outset that his amended declaration speaks only of losses incurred after he was discharged. Thus, he has alleged only damages against which the county is immunized. *See Rittenhouse v. Baltimore,* 25 Md. 336, 349 (1866). His

attempted reliance upon Section 1A to avoid sovereign immunity is misplaced. By its terms, Section 1A requires a "written contract" that was "executed on behalf of the county." A failure to meet either of these requirements nullifies the operation of the section. *See Mass Transit Admin. v. Granite Constr.*, 57 Md.App. 766, 780, 471 A.2d 1121 (1984). Invoking our decision in *Staggs v. Blue Cross of Maryland*, 61 Md.App. 381, 486 A.2d 798 (1985), Leese asserts that the county code and regulations qualify as a written contract. Next, borrowing from *Dep't of Gen. Serv. v. Cherry Hill Sand and Gravel Co.*, 51 Md.App. 299, 443 A.2d 628 (1982), Leese attempts to supplement the written statutory contract with oral understandings between him and the appellees. Although this imaginative argument may have some facial validity, it addresses only one of the two requirements of Section 1A. It does not address the need for an executed contract. The appellant does not suggest that his contract with the appellees was ever executed. In any case, his allegations as to an implied or oral contract are factually insufficient. Hence, his effort to mold this case to Section 1A must fail.

In short as pleaded, neither his common law tort nor contract claims are assertable against the county.

### B. *Official Immunity*

■ While governmental immunity immunizes political subdivisions against the torts committed by their employees, it does not offer the same protection to all the employees who commit the alleged wrongs. *Duncan v. Koustenis*, 260 Md. 98, 104, 271 A.2d 547 (1970). To guard against the hardship that this exposure to liability would place on certain public servants, the courts have fashioned the doctrine of public official immunity. This doctrine, however, only becomes an issue when

1) The public servant is a 'public official';

2) the alleged culpable conduct was committed by him while acting in a discretionary capacity; and

3) the official acted without actual malice.

*Bradshaw v. Prince George's County,* 284 Md. 294, 302–03, 396 A.2d 255 (1979); *Robinson v. Bd. of County Commissioners,* 262 Md. 342, 346–47, 278 A.2d 71 (1971); *Arrington v. Moore,* 31 Md.App. 448, 464, 358 A.2d 909, *cert. denied,* 278 Md. 729 (1976).

Leese's amended declaration alleges facts sufficient to establish the second element of official immunity. Clearly, when the appellees wronged the appellant, they did so while exercising their discretionary capacities to evaluate job applicants and to hire and fire employees. Moreover, it is undisputed that all the alleged culpable conduct occurred while the supervisory employees were on the job. *See Arrington,* 31 Md.App. at 456–59, 358 A.2d 909.

We turn next to the third element. The actual malice needed to defeat official immunity requires "an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and wilfully injure the plaintiff." *Arrington,* 31 Md.App. at 464, 358 A.2d 909 (quoting *H & R Block, Inc. v. Testerman,* 275 Md. 36, 43, 338 A.2d 48 (1975)). In this case, the appellant has alleged that the appellees tortiously injured him "for personal reasons and with bias and prejudice against" him. The declaration further alleges that they "were prompted to fire and terminate [appellant's] employment for improper and illegal motives which were contrary to the public policy of the state" and that this discharge "was motivated by retaliation for exercising his legal rights to appeal."

Actual malice does not always have to be shown with specificity; it can be inferred. *Henderson v. Maryland Nat'l Bank,* 278 Md. 514, 523, 366 A.2d 1 (1976). In *Henderson,* for example, the Court of Appeals ruled that actual malice could be inferred from a bank's having bickered with a customer for a period preceding its breach of a contract. The instant case is similar to *Henderson* in that it contains an alleged personality conflict between Leese and some supervisory employees. Thus, it is inferrable

from the well-pleaded facts that the appellees acted out of spite and hatred when they denied Leese the position, dismissed him and tortiously injured him.

 These allegations, if proved, would be sufficient to negate the third public official immunity factor. Since all three factors must exist to establish immunity, the amended declaration prevented the successful assertion of that immunity by way of motion to dismiss. Thus, we need not decide whether the allegations showed that the individual appellees were "public officials" as that term is used in the immunity context.

### C. *Immunity Under 42 U.S.C. § 1983*

 Although the common law immunities discussed thus far address the appellant's tort and contract claims, they do not govern the resolution of the alleged constitutional infractions which comprise the bulk of this case. Immunities to suit under 42 U.S.C. § 1983 have been frequently litigated. *See, e.g., Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Out of this litigation, two hard and fast rules have emerged. First, municipalities and counties are not immune from suit. *Owen,* 445 U.S. at 638, 100 S.Ct. at 1409. Appellee Baltimore County, therefore, has no immunity from Leese's § 1983 claims. Second, based on statutory construction and policy reasons, certain official immunities long-recognized at common law have been deemed to apply in § 1983 cases. *See Wood,* 420 U.S. at 315–22, 95 S.Ct. at 997–1001.

From the standpoint of statutory construction, the notion that public officials should be accorded some form of immunity was viewed as being so deeply rooted in the common law that Congress's failure to negate it indicates that it

survived the adoption of § 1983.[14] *See, e.g., Pierson v. Ray*, 386 U.S. 547, 554–55, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967). The policies supporting the extension of official immunity have been justified "on two mutually dependent rationales: (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to exercise his office with the decisions and public judgment required by the public good." *Scheur*, 416 U.S. at 240, 94 S.Ct. at 1688. Furthermore, "the threat of personal liability might deter citizens from holding public office." *Owen*, 445 U.S. at 654 n. 38, 100 S.Ct. at 1417 n. 38.

Although these policy considerations are important, they must be balanced against the interests of private citizens whose constitutional rights have been intruded upon by the errant official. *Butz v. Economou*, 438 U.S. 478, 503–08, 98 S.Ct. 2894, 2909–11, 57 L.Ed.2d 895 (1978). In recognition of these competing interests, the Court has recognized absolute and qualified immunities. Absolute immunity shields these "officials whose special functions or constitutional status requires complete protection from suit." *Harlow*, 457 U.S. at 807, 102 S.Ct. at 2732. *See also Imbler v. Pachtman*, 424 U.S. 409, 421–24, 96 S.Ct. 984, 990–92, 47 L.Ed.2d 128 (1976) (explaining policies behind absolute immunity). As an example, the *Harlow* court compiled the following list of officials cloaked with absolute immunity:

> legislators, in their legislative functions, see, *e.g., Eastland v. United States Servicemen's Fund*, 421 U.S. 491 [95 S.Ct. 1813, 44 L.Ed.2d 324] (1975), and of judges, in their judicial functions, see, *e.g. Stump v. Sparkman*, 435 U.S. 349 [98 S.Ct. 1099, 55 L.Ed.2d 331] (1978), now is well settled. Our decisions also have extended absolute

---

**14.** These common law immunities, as preserved under 42 U.S.C. § 1983, would apply with equal force to common law actions for violations of constitutional rights.

immunity to certain officials of the Executive Branch. These include prosecutors and similar officials, see *Butz v. Economou,* 438 U.S. 478, 508–512 [98 S.Ct. 2894, 2911–2916, 57 L.Ed.2d 895] (1978), executive officers engaged in adjudicative functions, *id.,* at 513–517 [98 S.Ct. at 2914–2916], and the President of the United States, see *Nixon v. Fitzgerald,* ante, [457 U.S.] p. 731 [102 S.Ct. 2690, 73 L.Ed.2d 349 (1982)].

457 U.S. at 807, 102 S.Ct. at 2732.

 Clearly, none of the individual appellees in this suit even approach the level of status that would merit absolute immunity. Rather, they warrant at most the qualified immunity accorded all other public employees. *See Procunier,* 434 U.S. at 561–66, 98 S.Ct. at 859–62. In *Harlow* the court explained the scope of this immunity:

Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official. [citation omitted]. Decisions of this Court have established that the 'good faith' defense has both an 'objective' and a 'subjective' aspect. The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.' [citation omitted]. The subjective component refers to 'permissible intentions.' [citation omitted]. Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would not be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official *'knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury . . . .' [citation omitted].

457 U.S. at 815, 102 S.Ct. at 2736 [emphasis in original].

 With regard to a knowing violation of a constitutional right, the essential focus is whether the law existing at

the time of the alleged violation proscribed what occurred. *Procunier,* 434 U.S. at 562, 98 S.Ct. at 859. "[A]n official has, of course, no duty to anticipate unforeseeable constitutional developments." *O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 2495, 45 L.Ed.2d 396 (1975). When the law is settled, however, it is difficult for the official to argue his ignorance of it because the law charges a reasonably competent official with knowing the law governing his conduct. *Harlow,* 457 U.S. at 818–19, 102 S.Ct. at 2738–39.

In this case we have already determined that Leese has sufficiently alleged that he was fired in retaliation for exercising his First Amendment right to petition government for redress of grievances. On October 7, 1982, Leese was unofficially notified that his employment with the county would come to an end on October 22, 1982. In January of that year, the Court of Appeals decided *DeBleeker v. Montgomery County,* 292 Md. 498, 438 A.2d 1348 (1982), a case that declared firing an employee for exercising his First Amendment rights to be unconstitutional. In doing so, the Court of Appeals cited *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) and *DiGrazia v. County Executive for Montgomery County,* 288 Md. 437, 418 A.2d 1191 (1980). From this we conclude that the constitutional proscription on such retaliatory dismissal was well-established when the decision to dismiss Leese was made. Thus, no immunity from § 1983 exists here.

 Turning to the second instance when immunity from § 1983 does not exist, it is apparent that, rather than the actual malice standard required under Maryland's official immunity law, the federal § 1983 counterpart can be satisfied by either actual malice or its legal equivalent. The latter includes a reckless disregard for the injured party's rights. *Procunier,* 434 U.S. at 562, 98 S.Ct. at 859. To meet the burden of pleading malice, the appellant's amended declaration must contain more than his legal conclusion on the issue. For the reasons stated in our discussion of the immunity under state law, we conclude that actual

malice was alleged here. Leese in substance claimed he was deliberately discharged in retaliation for exercise of his First Amendment rights. Thus, in the context of the motion to dismiss, Leese's § 1983 claim is not barred by official immunity as a matter of law.

## VII. *Punitive Damages*

Among appellees' many objections to Leese's amended declaration was one going to the propriety of punitive damages claimed against the individual appellees in count VII (denial of Fourteenth Amendment due process in hiring), count VIII (firing in retaliation for exercise of First Amendment rights—abusive discharge), and count IX (defamation) and against all the appellees in count X (violation of § 1983) and count XI (intentional infliction of emotional distress). Since we have held that the amended declaration failed to state a cause of action under counts VII and XI, we need not consider them further.

As to the abusive discharge counts against the individuals, assuming Leese's allegations are supported by proof and liability is established (thereby rejecting whatever defenses the individuals assert) punitive damages are recoverable if Leese shows actual malice. The abusive discharge claim against the individuals, unlike the similar claim against the county, is framed as a tort claim. The tort, however, is one arising out of contract, thus requiring proof of actual malice as a prerequisite to the recovery of punitive damages. *See Miller Building Supply v. Rosen,* 61 Md. App. 187, 485 A.2d 1023, *cert. granted,* 303 Md. 43, 491 A.2d 1197 (1985); *Adler,* 538 F.Supp. at 580. As to the defamation claim, if liability is established under it, punitive damages are recoverable. So far as the § 1983 claim is concerned, even if liability under it is demonstrated by proof, the county is not subject to punitive damages. *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The contrary is true as to the individual appellees. *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983).

## SUMMARY

The trial court did not err in dismissing Leese's claim for denial of due process in connection with his non-hiring and his discharge (except to the extent those claims are based on a liberty interest infringed upon by the retaliatory discharge), the common law infliction of emotional distress claim, the common law abusive discharge claim against the county, and the common law defamation claim against the county.

On the other hand, the court did err in dismissing the First and Fourteenth Amendment claims asserting, against the county and the individual appellees, discharge in retaliation for exercise of constitutional rights, the similar § 1983 claims against all appellees, the abusive discharge claim against the individual appellees, and the defamation claims against the individual appellees. The case must be remanded for further proceedings as to those claims, subject to whatever proof Leese may produce and whatever defenses the appellees may successfully establish.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEES.